UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

RYAN WHITNEY, M.D.

                      Plaintiff,                          Dkt. No.

      -against-                                **COMPLAINT**

MONTEFIORE MEDICAL CENTER and
ALBERT EINSTEIN COLLEGE OF MEDICINE,

                                                    **JURY TRIAL DEMANDED**

                    Defendants.

------------------------------------------------------------------X

      Plaintiff Ryan Whitney, M.D., by his attorneys Giskan Solotaroff & Anderson LLP and Marek Weisman LLC, for his complaint against Defendants Montefiore Medical Center ("Montefiore") and Albert Einstein College of Medicine ("Einstein") alleges as follows:

## NATURE OF THE ACTION

      1.      This is an action for disability discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794, the Americans with Disabilities Act of 1990 as amended ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the New York City Human Rights Law ("NYCHRL").

      2.      Plaintiff Ryan Whitney, M.D., ("Dr. Whitney") was enrolled in the anesthesiology medical residency program administered by Defendants Montefiore and Einstein and was employed as house staff at Montefiore.

1

3. Dr. Whitney has attention deficit hyperactivity disorder ("ADHD"), a recognized disability under the Rehabilitation Act, the ADA, and the NYCHRL. Defendants failed to accommodate Dr. Whitney's disability and discriminated against him in several respects, including failing to implement reasonable accommodations which it had agreed to, and retaliating against Dr. Whitney by subjecting him to harassment and punitive treatment, unfair performance reviews, and eventually terminating him from the residency program and terminating his employment.

4. Defendants' unlawful conduct was knowing, malicious, willful, and wanton and/or showed a reckless disregard for Dr. Whitney's protected rights, which has caused and continues to cause Plaintiff to suffer substantial economic and non-economic damages. As a result, Dr. Whitney has and will suffer hundreds of thousands of dollars in economic damages as well as damages for severe emotional distress.

## THE PARTIES

5. Ryan Whitney, M.D. is domiciled in New York, New York. At all relevant times, Dr. Whitney met the definition of an "employee" under all applicable statutes.

6. Defendant Montefiore is a not-for profit-corporation organized under the laws of New York. Together with Defendant Einstein, Montefiore administers the Anesthesiology Residency Program.

7. Defendant Einstein is an educational institution chartered by the Board of Regents of the New York State Department of Education. Together with Defendant Montefiore, Einstein administers the Anesthesiology Residency Program.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over the claims made pursuant to the Rehabilitation Act pursuant to 28 U.S.C. §1331.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA. This action is authorized and instituted pursuant to the ADA as amended, 42 U.S.C. §§ 12101 *et seq*. Dr. Whitney filed a complaint with the Equal Employment Opportunity Commission on or about April 26, 2021 and received a Notice of Right to Sue on or about September 20, 2021. The Notice of Right to Sue is attached hereto as Exhibit A.

10. This Court has jurisdiction over the claims made pursuant to the NYCHRL pursuant to 28 U.S.C. §1367.

11. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b) as Defendants are located in this District.

12. This Court has personal jurisdiction over Defendants because they are established under the laws of New York State and operate in New York State.

**THE FACTS**

13. Dr. Whitney is a graduate of Miami University and the University of Louisville Medical School.

14. In July 2018, Dr. Whitney started the three-year Anesthesiology Residency Program administered by Defendants ("the Program").

15. Dr. Whitney was originally diagnosed with attention deficit hyperactivity disorder ("ADHD") in 1996 when he was in sixth grade.

16. Throughout high school, college, and medical school, Dr. Whitney was able to function and succeed with reasonable accommodations for his ADHD where necessary.

17. On October 26, 2018, Dr. Whitney disclosed his ADHD disability to his immediate supervisor, Sujatha Ramachandran, M.D., who was the Program Director of the Anesthesiology Residency Program and Assistant Professor of Anesthesiology at Einstein. Dr. Ramachandran said she was familiar with the condition and the difficulties ADHD could create, and initially appeared to be willing to reasonably accommodate Dr. Whitney's condition as needed.

18. Dr. Whitney subsequently discussed his disability on several occasions with Dr. Ramachandran and others, including Dr. Catherine Skae, Vice President for Graduate Medical Education at Montefiore and Associate Dean for Graduate Medical Education at Einstein.

19. Despite these discussions, neither Dr. Ramachandran nor any other supervisor or attending physician in the Program made an effort to accommodate Dr. Whitney's ADHD at any time during this period, and Dr. Ramachandran told Dr. Whitney several times that because of Dr. Whitney's ADHD, "anesthesiology might not be for you."

20. Instead, after disclosing his disability to Dr. Ramachandran, Dr. Whitney was consistently singled out for harassment and unjustified scrutiny and unfair criticism on the basis of his ADHD by attendings and supervisors in the Program.

21. Attendings in the residency program acknowledged that Dr. Whitney was singled out in this way.

22. Despite the discrimination and retaliation he endured, Dr. Whitney continued to perform his duties competently and skillfully. Montefiore consistently trusted Dr. Whitney to

administer anesthesia during surgical procedures without restriction or supervision from attending anesthesiologists.

23. On September 30, 2020, Dr. Whitney was advised by Dr. Ramachandran that an anesthesiology department committee had recommended his termination. The "reasons" Dr. Ramachandran provided for this action were pretextual and the true basis was solely a bias against Dr. Whitney due to ADHD and issues symptomatic of Dr. Whitney's unaccommodated ADHD.

24. Later that day, Dr. Whitney was summarily suspended from his training and clinical duties by Gregory Kim, M.D., who was the Anesthesiology Residency Program's Assistant Director. This adverse action was not consistent with Defendants' written policies and procedures regarding resident due process. Dr. Whitney was not provided any explanation nor documentation for the suspension.

25. On October 5, 2020, Dr. Whitney was called before an ad hoc review committee to defend himself against potential termination. Dr. Whitney informed the committee that he could perform the essential functions of his job according to the Program's expectations if he was afforded accommodations for his ADHD.

26. On October 14, 2020, Dr. Whitney received a letter from Dr. Ramachandran finally acknowledging that Dr. Whitney had requested disability accommodations. Dr. Ramachandran's letter set forth an extensive list of requirements Dr. Whitney would have to fulfill in order to obtain accommodations.

27. On Friday, October 23, 2020, Dr. Whitney's counsel provided Montefiore's Occupational Health Services with a letter requesting specific accommodations specifically

tailored to anesthesiology residents with ADHD. Montefiore agreed to provide Whitney with these accommodations.

28. On November 11, 2020, counsel for Montefiore wrote a letter to Dr. Whitney's counsel suspending the termination for three months and stating that Montefiore would implement some of the reasonable accommodations requested in the October 23, 2021, letter to enable him to adequately perform his duties.

29. However, Defendants thereafter failed to fully implement the agreed-to reasonable accommodations whatsoever and/or did so in bad-faith.

30. For the most significant accommodation, which was providing Dr. Whitney with daily feedback, some of the anesthesiology attendings expressed extreme annoyance and resentment to Dr. Whitney and then provided unwarranted negative feedback in a punitive fashion.

31. In addition, immediately subsequent to Dr. Whitney seeking accommodations for his disability, the harassment, and unfair treatment escalated and intensified.

32. The escalated acts of harassment included the following:

   a. attending physicians evaluating Dr. Whitney negatively when they had not worked with him during the evaluation period;

   b. attending physicians providing negative evaluations of Dr. Whitney when they had told him he had performed satisfactorily;

   c. supervisors failing to seek evaluations of Dr. Whitney from physicians with whom he had worked and who regarded him positively;

   d. supervisors in the program faulting Dr. Whitney for situations which were common-place and for which other anesthesiology residents were not disciplined;

    e.   attending physicians yelling at Dr. Whitney, threatening him with physical violence and on one occasion, assaulting him;

    f.   attending physicians making completely unjustified criticisms of Dr. Whitney, including, for example, an attending physician telling Dr. Whitney he did not speak Spanish well enough to communicate with Spanish-speaking patients when Dr. Whitney is a fluent speaker and predominantly speaks Spanish at home;

33.    Many physicians and medical staff members expressed surprise and consternation at the harsh and unfair manner in which certain anesthesiology attending physicians treated Dr. Whitney.

34.    Many of the attendings who worked with Dr. Whitney evaluated him positively, stating either that he was functioning at the level of his peers and that his performance had significantly improved during his tenure in the residency.

35.    To the extent other attendings stated that Dr. Whitney's performance was deficient, they generally characterized Dr. Whitney as being a year behind in his training – functioning at the level of a second-year resident even though he was in this third year of the residency. This was hardly surprising, however, given that Dr. Whitney's training was significantly impacted by the COVID pandemic, which prevented him from working in the operating room for a significant portion of his second year of training.

36.    Dr. Whitney repeatedly communicated to Defendants through counsel that he was continuing to be discriminated and retaliated against on account of his disability, that he wished to be treated fairly and in a non-discriminatory fashion, and that he was not receiving the reasonable accommodations he had requested.

37. On April 14, 2021, Dr. Whitney's employment and participation in the Program was terminated due to allegedly "endangering patient safety," even though Dr. Whitney had been working mostly without supervision, and without any patient safety incidents cited previously that could be reasonably attributed to him. The April 14, 2021, termination letter stated specifically that "principles of patient safety dictate that [Dr. Whitney] no longer continue in the [residency program.]"

38. Furthermore, Defendants treated Dr. Whitney differently than similarly situated peers. Another resident who preceded Dr. Whitney in the program by one or two years, and to Dr. Whitney's knowledge did not suffer from ADHD, had experienced clinical competency issues to a far greater degree – to the extent that he had endangered and harmed patients. Yet the Program provided that resident an additional year of training and permitted the resident to finish the program. Meanwhile, despite the fact that by all accounts Dr. Whitney's performance had improved during the period since his reinstatement, and that at worst, he was a year behind in his training, Defendants terminated Dr. Whitney from the Program and from his employment at Montefiore.

39. There was no precedent for Dr. Whitney's termination, which is further evidence he has been singled out in a retaliatory manner. Although attending physicians in the residency program have acknowledged that there have always been anesthesiology residents with clinical competency issues, including residents who have "horrible reputations," Dr. Whitney, who to his knowledge is the only resident who has disclosed to the program an ADHD diagnosis, is the only resident to be terminated from the Program. Both at Montefiore and at other residency programs, the standard approach to a lagging resident is not termination, which deprives him or her of an entire medical career, but instead a remediation plan and/or extension of training.

40. Subsequently, at the review hearing pursuant to Defendants' due process procedures, Defendants violated the procedures by not requiring witnesses identified by Dr. Whitney as offering testimony favorable to him to testify.

41. In addition, even though the Anesthesiology Program stated that Dr. Whitney was being terminated because of patient safety concerns, and indeed that was the only basis to immediately terminate a resident prior to the completion of the due process procedure, Defendants failed to establish at the hearing that Dr. Whitney had endangered patient safety. Defendants only introduced evidence of one situation in which Dr. Whitney had even allegedly endangered patient safety and all of the contemporaneous evidence at the hearing established that Dr. Whitney acted appropriately during that situation and the patient's safety was not compromised. Notably, there is no indication that Defendants informed the patient's parents that their child had been endangered, engaged in any of the internal processes that are supposed to be followed where patient safety is put at risk, or reported the alleged incident to Montefiore's risk management department or malpractice insurance carrier, or to governmental bodies that require the reporting of such incidents.

42. On October 13, 2021, the review panel affirmed Dr. Whitney's termination, contrary to the strong weight of evidence and in violation of Defendants' procedures.

43. As a result of Defendants' discriminatory and retaliatory conduct, Dr. Whitney has been significantly delayed and has likely lost the opportunity to complete his residency training in anesthesiology, which would have enhanced his career, and which has resulted in a substantial loss of potential earnings.

## FIRST CLAM FOR RELIEF
### 42 U.S.C. § 12112
(ADA Title I Disability Discrimination and Failure to Accommodate)

44. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

45. During all relevant periods herein, Plaintiff has suffered from a disability, ADHD, which has substantially limited his relevant major life activities.

46. Plaintiff requested reasonable accommodations and at all relevant times was qualified to perform the essential duties of his employment with the requested reasonable accommodations.

47. Defendants did not make a good faith effort to accommodate Plaintiff's disability.

48. All the accommodations that Plaintiff requested were reasonable.

49. None of the accommodations that Plaintiff requested would have created undue hardship for Defendants.

50. Defendants failed to communicate with Plaintiff meaningfully and in good faith concerning his disability and requested accommodations.

51. Defendants discriminated against Plaintiff in violation of the ADA by refusing to accommodate his disability.

52. Defendants knowingly and intentionally discriminated against Plaintiff because of his disability.

53. Plaintiff suffered injuries as a result of Defendants' failure to reasonably accommodate his disability.

54. Defendants' failure to accommodate Plaintiff's disability was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

55.     Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when they refused to provide a reasonable accommodation for his disability.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 12203**
(Retaliation under the Americans with Disabilities Act)

56.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

57.     Plaintiff engaged in protected activity when he notified Defendants of his disability, asked Defendants for reasonable accommodations, and complained that Defendants were discriminating against him based on his disability.

58.     Plaintiff engaged in protected activity when he opposed Defendants' refusal to accommodate his disability and its retaliation against him for his protected activity.

59.     As a direct result of Plaintiff's request for a reasonable accommodation and opposition to conduct prohibited by the ADA, Defendants retaliated against Plaintiff by failing implement reasonable accommodations which it had previously agreed to, subjecting him to harassment and punitive treatment and eventually terminating him from the residency program and terminating his employment.

60.     Defendants treated Plaintiff less favorably than his similarly situated counterparts who were not disabled and who did not engage in protected activity.

61.     Defendants interfered with Plaintiff in the exercise and enjoyment of his rights under the ADA.

62.     Defendants' retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

63. Defendants' conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

### THIRD CLAIM FOR RELIEF
(Disability Discrimination in Violation of Rehabilitation Act)

64. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

65. At all times relevant to this action, Defendants are recipients of federal financial assistance. This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement and federal research grants.

66. Moreover, Defendants are principally engaged in the business of providing health care.

67. Plaintiff was an otherwise qualified individual with a disability.

68. Defendants violated Section 504 of the Rehabilitation Act of 1973, 29 USC §794, by failing to accommodate Plaintiff's disability and subjecting Plaintiff to discrimination in employment as a result of his disability.

69. Solely by reason of Plaintiff's disability, he was excluded from employment and educational opportunities by Defendants and was wrongfully subjected to discrimination.

### FOURTH CLAIM FOR RELIEF
(Retaliation in Violation of Rehabilitation Act)

70. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

71. At all times relevant to this action, Defendants are recipients of federal financial assistance. This federal financial assistance includes but is not limited to Medicare/Medicaid reimbursement and federal research grants.

72. Defendants retaliated against Plaintiff based on his exercise of his rights under the Rehabilitation Act and his opposition to disability discrimination in violation of the Act.

## FIFTH CLAIM FOR RELIEF
(Disability Discrimination in New York City Human Rights Law)

73. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

74. Defendants failed to accommodate Plaintiff's disability and discriminated against him in the terms and conditions of his employment in violation of the New York City Human Rights Law.

## SIXTH CLAIM FOR RELIEF
(Retaliation in Violation of New York City Human Rights Law)

75. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

76. Defendants retaliated against Plaintiff because of his opposition to disability discrimination in violation of the New York City Human Rights Law.

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.

**WHEREFORE**, Plaintiff demands judgment against Defendants:

A. Reinstating Plaintiff's employment and participation in the Montefiore Anesthesiology Residency program, and upon reinstatement, enjoining Defendants from discriminating or retaliating against Plaintiff on the basis of his disability or his opposition to disability discrimination.

B. Awarding Plaintiff lost wages and compensatory damages including damages for emotional distress;

C. Awarding Plaintiff punitive damages;

D. Awarding reasonable attorneys' fees, costs, and expenses; and

Granting such other legal and equitable relief to the Plaintiff as the Court may deem just and equitable.

Dated:	New York, New York
	November 19, 2021

GISKAN SOLOTAROFF & ANDERSON LLP

By:	/s/ *Jason Solotaroff*
	Jason L. Solotaroff
	90 Broad Street
	New York, New York 10004
	(646) 964-9640

MAREK WEISMAN LLC

Sherman Marek
Rachel Rutter
Steen Kadison
(all pending pro hac vice admission)
55 E Monroe St. Suite 3800
Chicago, Illinois 60603
312-470-7662