UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYAN WHITNEY, M.D., | |
| Plaintiff, | 21 Civ. 9623 (PAE) |
| -v- | |
| | OPINION & ORDER |
| MONTEFIORE MEDICAL CENTER, *et al.*, | |
| Defendants. | |

PAUL A. ENGELMAYER, District Judge:

This case involves discrimination and related claims by a medical doctor to the effect that he was terminated from his residency based on his attention-deficit hyperactivity disorder ("ADHD"). In 2018, Dr. Ryan Whitney began a three-year anesthesiology residency at Montefiore Medical Center ("Montefiore"). During the next two years, senior Montefiore staff expressed concerns about Whitney's limited medical knowledge, substandard technical skills, questionable treatment of patients, repeated poor performance on standardized tests, and unauthorized moonlighting. In 2020, Montefiore sought to fire him. He requested accommodations and a second chance; Montefiore agreed. Six months later, after receiving additional complaints about Whitney's performance, and after he once again failed a mandatory standardized licensing test, Montefiore fired Whitney for good.

Whitney brings claims of disparate treatment, retaliation, and failure to accommodate against Montefiore under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* These all center on Whitney's allegation

that Montefiore terminated him because of his disability—his ADHD.  He claims that

Montefiore's proffered reasons for his discharge are a pretext for discrimination.

 Montefiore now moves for summary judgment as to Whitney's federal claims.  For the

reasons that follow, the Court grants Montefiore's motion, and declines to exercise supplemental

jurisdiction over Whitney's state law claims.

## I. Background[1]

### A. Facts

 To assist the reader in navigating this case's complex factual history, the Court first

provides an overview of Whitney's residency at Montefiore.  It then reviews the evidence that

---

[1] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, the parties' joint statement of undisputed facts, Dkt. 57 ("JSF"); Montefiore's Rule 56.1 statement, Dkt. 63 ("Def. 56.1"); the declarations in support of the motion, plus attached exhibits, of Dr. Sujatha Ramachandran, Dkt. 61 ("Ramachandran Decl."), Dr. Michael Rufino, Dkt. 62 ("Rufino Decl."), and Jean L. Schmidt, Dkt. 65 ("Schmidt Decl."); Whitney's Rule 56.1 counter-statement, Dkt. 75 ("Pl. 56.1"); the declarations in opposition to the motion, plus attached exhibits, of Jason L. Solotaroff, Dkt. 70 ("Solotaroff Decl."), and Dr. Ryan Whitney, Dkt. 72 ("Whitney Decl."); Montefiore's reply to Whitney's Rule 56.1 counter-statement, Dkts. 82–83 ("Def. Reply 56.1"); and the reply declaration of Jean L. Schmidt in support of the motion, Dkt. 84 ("Schmidt Reply Decl."), and attached exhibits.  The transcripts of various depositions are cited herein, including those of Dr. David Adams, Solotaroff Decl., Ex. 1 ("Adams Dep."); Dr. Michael Chyfetz, *id.*, Ex. 2 ("Chyfetz Dep."); Dr. Ellise Delphin, *id.*, Ex. 3 ("Delphin Dep."); Dr. Gregory Kim, *id.*, Ex. 4 ("Kim Dep."); Dr. Patricia Mack, *id.*, Ex. 5 ("Mack Dep."); Dr. Edward C. Nemergut II, *id.*, Ex. 6 ("Nemergut Dep."); Dr. Irene Osborn, *id.*, Ex. 7 ("Osborn Dep."); Dr. Sujatha Ramachandran, *id.*, Ex. 8 ("Ramachandran Dep."); Dr. Michael Rufino, *id.*, Ex. 9 ("Rufino Dep."); Dr. Ryan Whitney, *id.*, Ex. 10 ("Whitney Dep."); Dr. Tracey Straker, *id.*, Ex. 11 ("Straker Dep."); and Dr. Naum Shaparin, *id.*, Ex. 113 ("Shaparin Dep.").  For exhibits and briefs with both internal and Bates-stamped numbering, the Court cites the Bates-stamped page numbers.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes

Whitney cites of alleged animus within Montefiore and of Montefiore's alleged failure to provide him with reasonable accommodations.  In reviewing the evidence and resolving this motion, the Court construes the evidence in the light most favorable to Whitney, as the non-movant, and draws all reasonable inferences in his favor.  *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

### 1.    Overview of Whitney's Residency

In July 2018, Whitney began as an anesthesiology resident at Montefiore.  JSF ¶ 3.  His residency was scheduled to last three years.  JSF ¶¶ 5, 35.  The program allows residents to gain clinical anesthesia expertise through rotations in different subspecialties, such as obstetrics, pediatrics, and critical care.  JSF ¶ 7.  After their first month of training, residents serve on-call, and work "double covered."  Pl. 56.1 ¶¶ 187–88.  A resident is "double covered" when one supervisor (a more senior physician, known as an "attending") supervises two residents, each in his or her own room, at the same time.  Ramachandran Dep. 96.

From the start, there were stumbles in Whitney's relationship with Montefiore's senior staff.  In November 2018, he was placed on a six-week "program of academic remediation," taken off double coverage and on-call duties, and told he must "must reduce [his] anxiety and increase [his] confidence in the OR."  Schmidt Decl., Ex. 48 at 2; *see also* JSF ¶ 40; Pl. 56.1 ¶ 198.  A month later, the remediation plan came to an end, with one attending remarking on the "general consensus . . . that he is improving" but "needs to continue this upward trend."  Schmidt

---

of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Decl., Ex. 80 at 124; *see also id.*, Ex. 81 at 2.  He was placed back on double coverage and permitted to serve on-call.  JSF ¶ 45.

Over the next two years, Whitney received some positive feedback, and some negative feedback.  *Compare, e.g.*, Schmidt Decl., Ex. 80 at 123 (feedback dated February 7, 2019: "[Whitney] continued to perform well and demonstrate a continued improvement in his clinical skills that is commendable"), *with, e.g.*, Schmidt Reply Decl., Ex. 15 at 3 (feedback dated February 11, 2020: "[L]ooking at an overall picture . . . [I cannot] see [Whitney] upon graduating being relatively safe in even a low risk [obstetrics] environment, . . . nor on a trajectory to getting there anytime soon").  He passed some rotations and failed others.  JSF ¶¶ 53, 63, 71.

During this period, at least some Montefiore staff were concerned about Whitney's performance, and discussed terminating his residency.  *See, e.g.*, Solotaroff Decl., Ex. 85 at 13. Two recurrent sources of concern are notable.

First was Whitney's failure on standardized tests.  On two consecutive occasions (November 2019 and August 2020), Whitney failed the BASIC Exam, passage of which is a precondition of graduation and board certification.  JSF ¶¶ 48–51, 87.  Each time, he placed at or below the fourth percentile of examinees nationwide.  JSF ¶¶ 51, 87.  He neither sought nor received accommodations for either examination.  JSF ¶¶ 51, 87.  In another standardized test, the In-Training Exam, administered in February 2020, Whitney placed in the 12th percentile. Schmidt Decl., Ex. 80 at 67.

Second was the accuracy of Whitney's patient records.  In a random audit conducted in 2020, Montefiore found that Whitney had a 44% "drug-discrepancy" rate, far higher than the 5% departmental average; that is, 44% of the time that Whitney prescribed a narcotic, the use of that

narcotic was not recorded on the patient's chart.  JSF ¶¶ 78, 81; Def. 56.1 ¶ 27.[2]  The audit

followed a 2019 complaint raising a similar concern.  *See* Solotaroff Decl., Ex. 46 at 1

(describing Whitney's charting behavior as "unprofessional" and "unethical"); *see also* Straker

Dep. 140–41.

In September 2020, a senior departmental committee (the Clinical Competency

Committee or "CCC") recommended terminating Whitney's residency.  JSF ¶ 96; *see also* JSF

¶¶ 21–25.  The anesthesiology department's chair (the decisionmaker as to such terminations)

convened an ad-hoc committee of three physicians to review the CCC's recommendation.  The

ad-hoc committee met with Whitney; he attributed his various "issues" to his ADHD and stated

that he "need[ed] . . . accommodations to overcome" them.  Schmidt Decl., Ex. 83 at 19

(transcript of meeting).  All eight Montefiore attendings deposed in this lawsuit testified that

Whitney's statement to the ad-hoc committee marked the first time that they had learned of

Whitney's ADHD diagnosis.  *See, e.g.*, Adams Dep. 40; Delphin Dep. 48; Kim Dep. 79–80;

Osborn Dep. 26–27; Chyfetz Dep. 22; Rufino Dep. 94–95; Ramachandran Dep. 91; Straker Dep.

---

[2] Whitney disputes that the department understood 5% to be its average drug-discrepancy rate, but he does not undermine Montefiore's factual basis for asserting this or identify admissible evidence to the contrary.  Montefiore's basis for the departmental average was the declaration of the residency program's director, Dr. Sujatha Ramachandran.  Def. 56.1 ¶ 27.  Whitney challenges Ramachandran's statement as "inadmissible hearsay."  Pl. 56.1 ¶ 27.  But Whitney does not develop this objection, for example, by identifying the out-of-court statement on which Ramachandran was ostensibly relying.  Whitney also attempts to undermine Ramachandran's statement, asserting that she admitted in her deposition that she "is generally unaware of discrepancy rates," Pl. 56.1 ¶ 27, but the deposition pages that Whitney cites do not say that; indeed, Ramachandran's discussion of the point in her deposition bespoke familiarity with the subject, including in stating that the department viewed "the acceptable rate" of drug discrepancies as "usually four percent."  Ramachandran Dep. 538.  Finally, the Court rejects Whitney's claim that there is conflicting record evidence as to the department's drug-discrepancy average.  The exhibits he cites consist of partial results of particular audits, *see, e.g.*, Solotaroff Decl., Ex. 108 at 2 (audit of a week's worth of epidural use), and do not shed light on broader departmental figures.  The Court thus deems admitted Montefiore's claim that the department's average drug-discrepancy rate is 5%.  *See* S.D.N.Y. Local Rule 56.1(c).

80. Whitney testified, however, that he had earlier told several attendings about his diagnosis, including the residency program's director, Dr. Sujatha Ramachandran. *See* Whitney Dep. 110–19. In the end, the ad-hoc committee concurred in the recommendation to terminate Whitney, given his "poor medical knowledge," his substandard "clinical performance," and concerns about his "[p]rofessionalism," the latter of which centered on the recent revelation that he had violated Montefiore's prohibition on "moonlighting" for other hospitals. Schmidt Decl., Ex. 60 at 1–3. The ad-hoc committee noted, however, that Whitney's termination "may be temporarily delayed" to ensure "all potential accommodations for [his] newly surfaced diagnosis of ADHD are explored." *Id.* at 4.

In November 2020, Montefiore agreed to suspend Whitney's termination for three months and to provide him with various accommodations, including more frequent feedback, protected breaks, and an assigned mentor. JSF ¶ 112; *see also* Schmidt Decl., Ex. 34 at 1. Whitney was told that he must "demonstrate that he can perform the essential functions of his job" and correct his "patient care and professionalism problems." Schmidt Decl., Ex. 34 at 9. Montefiore warned Whitney that if he failed to improve, "the termination will proceed." *Id.*

For his accommodations period, Whitney was assigned to three rotations, each lasting one month. He failed two, JSF ¶¶ 124, 135, and did not receive a grade on the third, due to a preplanned two-week vacation, Pl. 56.1 ¶¶ 410–12; Def. Reply 56.1 ¶¶ 410–12. As before, he received both positive and negative feedback. The negative feedback included comments from attendings as to his "poor and inaccurate documentation" (Dr. Lewis Diamond), Schmidt Decl., Ex. 42 at 1, "the need for improvement in baseline technical skills" (Dr. Elizabeth Vue), *id.*, Ex. 43 at 2, his "extreme anxiety" in "complex cases" (Dr. Carlene Broderick), *id.*, Ex. 72 at 1, and his "very basic medical knowledge" and inability to "independently manage an anesthetic

without direct supervision" (Dr. Michael Chyfetz), *id.*, Ex. 74 at 1.  During this period, Whitney failed the BASIC Exam a third time, placing in the eighth percentile of examinees nationwide. JSF ¶ 116.  His accommodations period came to an end, as scheduled, in March 2021.

In April 2021, upon a renewed recommendation from the CCC, the anesthesiology department's interim chair, Dr. Naum Shaparin, terminated Whitney's residency.  Schmidt Decl., Ex. 22 at 1.  Pursuant to Montefiore's grievance policy, Whitney appealed Shaparin's decision to a hearing panel of five physicians unaffiliated with the department.  *See id.*, Ex. 56 at 5–6; JSF ¶ 150.  Over two days, the panel heard live sworn testimony from Whitney, six attendings, and one nurse, each of whom had worked with Whitney during his residency; Whitney was represented by counsel, who cross-examined Montefiore's witnesses.  JSF ¶¶ 153–55; Def. 56.1 ¶ 113; *see also* Solotaroff Decl., Exs. 15–17 (transcripts of witness testimony).  In October 2021, the panel "unanimously determined" that Whitney's dismissal "was based on a sound factual basis and sufficiently supported by a preponderance of the evidence."  Schmidt Decl., Ex. 46 at 3–4.  It found that Whitney "did not meet the minimum standards for a [third-year] resident for clinical competency," and had "demonstrated a pattern of repeated instances of poor judgment and lack of professionalism."  *Id.* at 1–2.

### 2.    Alleged Evidence of Animus During Whitney's Residency

Whitney identifies the following as evidence that Montefiore's proffered rationale for his termination was a pretext for disability discrimination.  This evidence falls into five categories.

#### a.    *Montefiore's continued reliance on Whitney's skills as a resident*

Whitney first points to what he terms the extensive responsibilities Montefiore gave him. After his six-week remediation period ended in December 2018, Whitney was permitted to serve on-call, "double covered," Pl. 56.1 ¶¶ 207, 368, 416, even when Montefiore was down to a

"skeleton crew," Kim Dep. 103.  Such shifts are difficult assignments.  Residents are not "double

covered" unless attendings are confident "the resident can behave appropriately in that

situation."  JSF ¶ 15; Shaparin Dep. 51.  "[T]hings happen at night, [and] there's only one

resident, one attending," which can lead to complications, as residency director Ramachandran

testified.  Ramachandran Dep. 200.

Whitney notes that his responsibilities did not change, even after he had received critical

feedback.  He continued to serve on-call, double covered, until his termination.  Pl. 56.1 ¶ 416.

This, he contends, establishes that Montefiore knew he could practice anesthesia safely.  Indeed,

just one month before his termination, Ramachandran informed the chief residents that Whitney

could be scheduled for on-call shifts.  *See* Solotaroff Decl., Ex. 94 at 1.  Whitney urges the

inference that Montefiore's entrusting him with important tasks belies its claim that he could not

safely handle such tasks.

### b.     *Montefiore's alleged deviations from its policies*

Whitney next points to what he contends were deviations from Montefiore's standard

operating procedures with respect to his initial remediation in November 2018, the initial

recommendation of his termination in September 2020, and his accommodations period in late

2020 and early 2021.  These, Whitney argues, reveal his termination as pretextual.  Had

Montefiore followed its standard procedures, he argues, he would not have been terminated.

***The initial remediation period***: Whitney alleges that, on remediation, he received worse

treatment than comparable coworkers.  He points to evidence that program director

Ramachandran created special evaluation forms to assess his performance.  JSF ¶ 40.  Several

attendings testified they were unaware of such forms being created to evaluate other residents.

*See, e.g.*, Chyfetz Dep. 44 ("Q: Have you ever used a form like this to evaluate any other resident

besides Dr. Whitney?  A: No, I have not."); Adams Dep. 26 ("I don't know of other forms.");
Rufino Dep. 57 ("[O]ccasionally, we ask for additional feedback from faculty . . . but I don't
recall seeing any specific forms.").  These evaluations required appraisal of Whitney's
"[p]reoperative assessment," his "[i]ntraoperative anesthetic conduct," and his "[o]rganizational
skills," as well as an overall determination of whether he "[c]an be safely double covered."  *E.g.*,
Solotaroff Decl., Ex. 24 at 1–2.  Whitney argues that Ramachandran used coded language in
these forms and in other conversations to refer to his ADHD, telling one attending, for instance,
that Whitney "has some organizational issues/concerns."  *Id.*, Ex. 44 at 1.

> ***The initial recommendation of his termination in September 2020***: Whitney challenges
several aspects of the initial recommendation to terminate his residency.  He notes that, unlike
other residents, he received three evaluations for his final pre–September 2020 rotation—two of
which were entered several months after the end of the rotation, days after the CCC
recommended his termination.  JSF ¶¶ 72–74; *see also* Ramachandran Dep. 56–57 ("Q: And how
many end of rotation evaluations are done for each resident at the end of a rotation?  A: One.").
The latter two evaluations were considerably more negative than the first.  One attending
testified that these evaluations were entered to "document what we were seeing" and "clarify the
reasons" for his termination.  Osborn Dep. 60.

> Whitney also highlights irregularities as to the composition of the ad-hoc committee and
the drafting of its report.  As to the committee's composition, one of its three members sat on the
CCC and had voted for its initial recommendation to terminate Whitney's residency.  JSF ¶ 100.
This, he contends, violated Montefiore's policy that such ad-hoc committees exclude those who
"actively participated in the determination to propose or impose the adverse action."  Schmidt
Decl., Ex. 56 at 4.  As to the report's drafting, the committee's conclusion changed over time;

Whitney argues that the committee's explanations for that shift have been inconsistent.  The committee initially planned to recommend Whitney's dismissal regardless of his ADHD.  Pl. 56.1 ¶ 262.  After several rounds of edits, however, the committee added a sentence stating that termination "may be temporarily delayed" to ensure "all potential accommodations for Dr. Whitney's newly surfaced diagnosis of ADHD are explored."  Pl. 56.1 ¶¶ 273–74.  One deponent testified that this sentence was added after "a discussion with . . . the hospital lawyers," Delphin Dep. 86, while another testified that no one "t[old] [the committee] to put" it in, Shaparin Dep. 118.  This inconsistency, in Whitney's view, is indicative of pretext.

 ***The accommodations period***: During his accommodations period, Whitney argues, Montefiore sought to bolster the case to dismiss him, rather than assist him to succeed.  He points to several incidents, most prominently a pediatric cleft-palate repair in December 2020.  During that operation, the patient's breathing tube was dislodged, causing Whitney to call an anesthesia "stat" (an emergency request for help).  Whitney Dep. 42.  Whitney states that the attending anesthesiologist told him he performed at a level commensurate with his experience.  Solotaroff Decl., Ex. 38 at 1.  However, two months later, Ramachandran solicited feedback from the surgeon, who criticized Whitney's "failure to react in an expeditious manner."  *Id.*, Ex. 39 at 1.  Ramachandran interpreted this to mean Whitney "endangered the patient."  Ramachandran Dep. 438.  She did not, however, share the surgeon's feedback with Whitney; place him on single coverage; alter his on-call schedule; or file a patient-safety report in Montefiore's "near-miss" system.  Ramachandran Dep. 487–92.

   *c.* *Allegedly inappropriate remarks by senior Montefiore staff*

 Whitney next notes comments by Ramachandran that suggest ill-will towards him dating to his first few months at Montefiore.  A few examples suffice.  In late 2018, during his

remediation period, she told other attendings that Whitney "[a]pparently . . . had a lawyer," which was "[a]ll the more reason to be on top of these evals."  Solotaroff Decl., Ex. 84 at 1.  In late 2019, when Whitney first failed the BASIC Exam, she wrote that Montefiore now had something "concrete" against him, which would "give some objectivity."  *Id.*, Ex. 29 at 1.  In 2020, when Whitney failed the BASIC Exam a second time, she stated that Montefiore was "doomed to keep him."  *Id.*, Ex. 90 at 1.  In early 2021, during Whitney's accommodations period, she told a colleague that he "[c]learly . . . is not succeeding and . . . cannot graduate but we need to prove our case."  *Id.*, Ex. 53 at 1.  Whitney argues that these disparaging comments show that Ramachandran's critiques of his performance were a ruse to facilitate his dismissal (an attempt to "prove [her] case") and did not reflect genuine concern about his abilities.

> ### d.   *Montefiore's alleged efforts to manufacture pretext during this litigation*

Whitney asserts that Montefiore's witnesses perjured themselves in depositions in this lawsuit to conceal Montefiore's anti-ADHD animus.  First, he claims, Ramachandran and program director Dr. Gregory Kim lied about when they first learned of his ADHD diagnosis.  Ramachandran testified she first learned of it in October 2020, after the CCC recommended his termination, and that she does not "recall him ever telling [her] he had ADHD."  Ramachandran Dep. 91–92.  Kim testified similarly.  Kim Dep. 79–80.  Whitney testified, however, that he told Ramachandran about his diagnosis in an October 2018 meeting, *see* Whitney Dep. 143–45, and cites an email he sent (which both Ramachandran and Kim received) that month, in which he wrote, "I kept reassuring program director . . . I have had ADHD my entire life and . . . I have been able to succeed and thrive[] because of it," Solotaroff Decl., Ex. 25 at 3.

Second, he claims Ramachandran lied about the context of various text messages and emails.  She was asked, for instance, about a December 2018 text message, in which she told

other attendings: "Apparently he had a lawyer.  All the more reason to be on top of these evals."

Solotaroff Decl., Ex. 84 at 1.  When shown the text message, she testified that she had not given

any thought to why Whitney had a lawyer or what kind of legal claim he might bring.

Ramachandran Dep. 177–78.  She was also asked about her statement in a January 2021 email:

"Clearly he is not succeeding and he cannot graduate but we need to prove our case."  Solotaroff

Decl., Ex. 53 at 1.  She testified:

> Q:   But you've already decided, have you, that Dr. Whitney will not be
>      successful?
> A:   On that particular day, as of that particular day, he's not succeeding and he
>      cannot graduate if he continued that way.
> Q:   And then you say, "we need to prove our case," right?
> A:   Correct.
> Q:   Who do you need to prove your case to?
> A:   To Dr. Whitney as well.  We're giving him accommodations, if he can
>      succeed with that, great.  If not, it's problematic.

Ramachandran Dep. 465 (objections omitted).  Whitney argues that Ramachandran dissembled

in this testimony—in particular, denying any animus towards him—to cover up wrongdoing.

### e.    *Montefiore's treatment of Whitney's asserted comparator*

Whitney contends that the hospital more favorably treated a fellow anesthesiology

resident, Dr. John Doe, who does not have ADHD and whose residency Whitney contends

presented comparable concerns.[3]  Def. 56.1 ¶ 134.  In 2018, in the first year of Doe's residency,

Doe was placed on a two-month remediation plan due to "significant concerns raised about [his]

performance."  Solotaroff Decl., Ex. 73 at 1.  These concerns continued into mid-2019, such that

Doe's obstetrics rotation was extended, with one attending commenting that Doe "is [s]till not at

the level that he can safely and reasonably practice OB anesthesia even on mediocre level."  *Id.*,

Ex. 71 at 1.  Like Whitney, Doe had professionalism issues; and like Whitney, Doe was accused

---

[3] For confidentiality, the Court refers to Whitney's asserted comparator by a pseudonym.

of changing a patient's chart without the attending's consent.  *See id.*, Ex. 76 at 1.  Doe was

ultimately required to "repeat his [first] year," which added "an extra six months" to his time at

Montefiore, Ramachandran Dep. 20, but graduated from Montefiore in 2020, JSF ¶ 161.

### 3.   Alleged Failures to Provide Accommodations During Whitney's Residency

Whitney alleges that Montefiore failed to provide reasonable accommodations.  The

parties' dispute relates to two of the 10 accommodations to which Montefiore agreed in

November 2020.  These were:

> 1.  [As to the request for a mutually agreed upon mentor and contact person:] . . .
> The Department will both (i) assign Dr. Whitney one designated contact person in
> the Department regardless of rotation (departmental coordinator), and (ii) assign Dr.
> Whitney a designated mentor for each rotation (rotation mentor).
>
> 2.  [As to the request for direct daily feedback.] . . .  The Hospital will instruct the
> attendings with whom Dr. Whitney works in each rotation to designate time at some
> point each day to speak with Dr. Whitney about the above items: (i) how Dr.
> Whitney managed his time, (ii) how Dr. Whitney prioritized his tasks, whether he
> appropriately focused on the right things, and whether he fixated on something that
> he should not have, and (iii) areas for improvement.

Schmidt Decl., Ex. 34 at 3–4.

As to a designated mentor, Montefiore assigned Dr. Tracey Straker, a specialist in general

anesthesia.  JSF ¶ 115.  Whitney asserts this was improper because Straker was assigned without

his advance knowledge or consent, despite his request for a "mutually agreed upon" mentor, Pl.

56.1 ¶ 317, and because he had earlier clashed with Straker, who advised him to consider another

field, Solotaroff Decl., Ex. 26 at 1, and described him to Ramachandran as "unethical" and

"unprofessional," *id.*, Ex. 46 at 1.

As to feedback, Whitney asserts he received far less than promised.  In a letter sent to

Montefiore in December 2020, one month into the accommodations period, Whitney's counsel

asserted that the feedback Whitney had thus far received was "begrudging and extremely

cursory." *Id.*, Ex. 32 at 2.  When Whitney was deposed on this point, however, he testified: "Feedback, I was getting it most days and that was fine."  Whitney Dep. 203.  Whitney's exhibits reflect 17 recordings of feedback sessions in December 2020, 14 of which are more than 15 minutes long.  *See, e.g.*, Solotaroff Decl., Exs. 96–112.

### B.    Procedural History

On November 19, 2021, Whitney filed the Complaint, which brings the above federal and state claims, with subject-matter jurisdiction based on the federal claims.  Dkt. 1 ("Compl.").  On June 6, 2023, after discovery, Montefiore moved for summary judgment as to Whitney's federal claims, Dkt. 60, and filed a supporting memorandum of law, Dkt. 64 ("Def. Br.").  On June 8, 2023, Whitney filed his opposition.  Dkt. 71 ("Pl. Br.").  On July 19, 2023, Montefiore filed a reply.  Dkt. 81 ("Def. Reply Br.").  On September 26, 2023, the Court heard argument.  Dkt. 98 ("Tr.").[4]

## II.   Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

---

[4] Whitney's Complaint named the Albert Einstein College of Medicine (the "College") as an additional defendant, alleging that it "administer[ed] the Anesthesiology Residency Program" alongside Montefiore.  Compl. ¶ 7.  He now stipulates that he did not have a contractual relationship with the College, Pl. 56.1 ¶ 2, and consents to its dismissal, *see* Pl. Br. at 23 n.170. The Court thus dismisses all claims against the College.

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, Inc., 445 F.3d 597, 603 (2d Cir. 2006). But "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224

F.3d 33, 41 (2d Cir. 2000).  Thus, even in such a case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

## III.     Discussion

Whitney's federal claims allege disparate treatment, retaliation, and failure to accommodate.  The Court addresses these in turn.

### A.     Disparate Treatment

#### 1.     Legal Standards

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The Rehabilitation Act prohibits "any program or activity receiving Federal financial assistance" from discriminating against an employee "solely by reason of her or his disability."  29 U.S.C. § 794(a).

Claims of discrimination under both the ADA and Rehabilitation Act are analyzed using the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).  At the first step of this analysis, the plaintiff bears the initial burden of making out, by a preponderance of the evidence, a *prima facie* case of discrimination by establishing that (1) "his employer is subject" to the ADA or Rehabilitation Act; (2) "he was disabled within the meaning of" the ADA or Rehabilitation Act; (3) "he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation"; and (4) "he suffered adverse employment action because of his disability."  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)

(quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).  Generally, the

burden of establishing a *prima facie* case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 506 (1993).  But a plaintiff cannot do so with "purely conclusory allegations of

discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.

1985).

    If the plaintiff meets his burden at the first step, "a presumption arises that more likely

than not the adverse conduct was based on the consideration of impermissible factors."  *Vega v.

Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty.

Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981)).  At that point, the burden of production shifts to

the defendant, which must "articulate some legitimate, nondiscriminatory reason" for the adverse

action.  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *McDonnell

Douglas*, 411 U.S. at 802).  The defendant's burden at this stage is "one of production, not

persuasion."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

    If the defendant meets that burden, at the third step the presumption of animus drops

away, and the plaintiff must show "that the real reason for the adverse employment decision was

discrimination."  *Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003).  In other

words, a plaintiff must "put forth adequate evidence to support a rational finding that the

legitimate non-discriminatory reasons proffered by the employer were false, and that more likely

than not the employee's disability was the real reason for the discharge."  *Davis v. Power Auth.

of N.Y.*, No. 22-488, 2023 WL 3064705, at *1 (2d Cir. Apr. 25, 2023) (cleaned up).  Ultimately,

"a reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the

reason was false, *and* that discrimination was the real reason."  *Hicks*, 509 U.S. at 515 (emphasis

in original).

### 2.    Discussion

Whitney's disparate-treatment claim is that Montefiore terminated him in April 2021 because of his ADHD.

The first three prongs of Whitney's *prima facie* case are undisputed or unchallenged on this motion.  Montefiore, as a recipient of federal financial assistance, is subject to the ADA and Rehabilitation Act.  *See, e.g.*, *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015).  Whitney's ADHD qualifies as a disability under both statutes.  *See, e.g.*, *Owens v. City of New York Dep't of Educ.*, No. 17 Civ. 519 (SHS), 2021 WL 3862974, at *13 (S.D.N.Y. Aug. 30, 2021), *aff'd*, No. 21-2875, 2022 WL 17844279 (2d Cir. Dec. 22, 2022).  And Montefiore does not seek summary judgment on whether Whitney was otherwise qualified to perform the essential functions of his role, with or without reasonable accommodations.[5]  That leaves the fourth *prima facie* prong: whether Whitney suffered an adverse employment action because of his disability.  Whitney's termination was undisputedly an adverse employment

---

[5] Although not a subject of the summary judgment motion, whether Whitney was otherwise qualified appears to present a substantial question, given the performance deficiencies chronicled in the record.  An employer "may not discriminate against people with disabilities that do not prevent job performance," but "when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017).  If symptoms of Whitney's ADHD (for instance, what he termed his lack of "attention to detail," Schmidt Decl., Ex. 83 at 19) left him unable to practice anesthesia, even with reasonable accommodations, Montefiore could then argue that he was not "otherwise qualified to perform the essential functions of his job." *E.g.*, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 170 (2d Cir. 2006); *see, e.g.*, *Jacobson v. Cap. One Fin. Corp.*, No. 16 Civ. 06169 (CM), 2018 WL 6817064, at *16 (S.D.N.Y. Dec. 12, 2018) ("A plaintiff's disability may not be used to shield him from the adverse consequences of inadequate job performance." (cleaned up)).  "Where . . . essential job functions necessarily implicate the safety of others," it is all the more important that the plaintiff "demonstrate that [he] can perform those functions in a way that does not endanger others." *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).  For purposes of this motion, the Court assumes *arguendo* that Whitney was otherwise qualified to perform the essential functions of his role.

action.  The parties dispute, however, whether he has adduced the minimal proof necessary to make out a *prima facie* case that the termination occurred *because of* his ADHD.

For the reasons that follow, it is not apparent that Whitney could clear even this low bar, given the limited evidence that decisionmakers at Montefiore, including those responsible for the termination, were driven by animus to his ADHD.  Instead, Whitney largely proposes to ask the factfinder to assume that anti-ADHD animus lay behind the hospital's actions because its conduct was, in his view, unfair, irregular, or harsh.

Nonetheless, at this stage of the litigation, there is little to be gained in assessing whether Whitney can make out a *prima facie* case, as opposed to focusing on the third step of the *McDonnell Douglas* analysis.  "[J]udicial inquiry into the *prima facie* case is usually misplaced" on motions for summary judgment.  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.); *see also Howard v. MTA Metro N. Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (collecting cases).  The *prima facie* burden is, after all, "*de minimis*." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  And once the employer has come forward with evidence sufficient to show "a legitimate, nondiscriminatory reason" for the adverse action, as all agree Montefiore has here, "the presumption" of discrimination "raised by the *prima facie* case is rebutted and drops from the case."  *Hicks*, 509 U.S. at 507 (cleaned up).  The sole issue that remains is whether a reasonable jury could find "the real reason for the adverse employment decision was discrimination."  *Mandell*, 316 F.3d at 381; *see also, e.g.*, *Burdine*, 405 U.S. at 253 (plaintiff must adduce evidence to satisfy his "ultimate burden of persuading the trier of fact" that he was "intentionally discriminated against").  In that inquiry, of course, "the evidence establishing the plaintiff's *prima facie* case" remains relevant, *Reeves*, 530 U.S. at 152, but the mere fact that a *prima facie* case had been found would not.

The parties' dispute at the third step thus boils down to this question: Would the admissible evidence permit a reasonable factfinder to find by a preponderance that Whitney was terminated because of his disability?  This inquiry focuses on the employer's motives.  *E.g.*, *In'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 394 n.15 (1977).[6]  The evidence must establish the employer's "actual knowledge, and real intent, not constructive knowledge and assumed intent."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001); *see also, e.g.*, *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

To do so, plaintiffs typically proceed in two familiar steps.  At the threshold, the plaintiff must show that the relevant decisionmaker(s) were aware of his disability.  Were the decisionmaker "truly unaware that such a disability existed, it would be impossible for her . . . decision to have been based, even in part, on [the plaintiff's] disability."  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003); *see also, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 89 (2d Cir. 2005) (no jury question as to pretext when plaintiff "failed to adduce evidence of

---

[6] Whitney's claim is one of disparate treatment, requiring him to establish "the most easily understood type of discrimination": intentional discrimination based on animus.  *Teamsters*, 431 U.S. at 394 n.15; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (discrimination "is, by definition, an intentional act"); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) (to bar intentional discrimination is to "prohibit[] certain motives").  In such cases, the issue is whether the employer's conduct—for example, a supervisor's scheduling a plaintiff for fewer shifts than other subordinates—was based on animus towards a protected characteristic of the plaintiff (*e.g.*, race, gender, disability), such that the adverse action would not have occurred but for that characteristic.  *Cf. Bostock v. Clayton County*, 140 S. Ct. 1731, 1739–40 (2020).  Whitney's claim is not in the nature of a disparate impact claim.  Such claims allege "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Teamsters*, 431 U.S. at 394 n.15.  Such claims thus do not require a showing of motive and do not include an "affirmative defense for good-faith (*i.e.*, nonracially motivated) conduct."  *Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring).  "[P]ractices that are not *intended* to discriminate but *in fact* have a disproportionately adverse effect on minorities" are thus forbidden under a theory of disparate impact, but not one of disparate treatment.  *Id.* at 577 (majority opinion) (emphasis added).

any communication" of her age to the executives "who actually made the discharge decision").

After demonstrating the decisionmaker's awareness of his disability, the plaintiff must then show

that the decisionmaker(s) "intentionally discriminated against" him on a forbidden ground—that

is, that his protected characteristic factored into their decisionmaking process. *Burdine*, 450 U.S.

at 253; *see, e.g.*, *Reeves*, 530 U.S. at 151–52 (jury question as to pretext when plaintiff adduced

evidence that the "actual decisionmaker behind [plaintiff's] firing" was "motivated by age-based

animus").  Such claims necessarily focus, then, on the employer's decisionmakers.

     In this case, however, the parties' briefs tend to treat Montefiore as a monolith.  *See, e.g.*,

Pl. Br. at 26–27 ("Montefiore's explanation of why it terminated [Whitney] . . . [is] the result of

an attempt to justify and conceal its discriminatory conduct."); Def. Br. at 11 ("[Whitney] has not

offered any evidence to suggest that Montefiore exhibited any discriminatory animus towards

him . . . .").  But the pertinent focus in imputing intentions to Montefiore, which "necessarily acts

through human beings," *Coryell v. Phipps*, 317 U.S. 406, 410 (1943), must be on the intentions

of Montefiore's agents—specifically, those who were responsible for the decisions at issue.  *See*

*Shager v. Upjohn Co.*, 913 F.2d 398, 404–05 (7th Cir. 1990) (Posner, J.) (animus must "be

imputed to" a corporation, for a corporation acts "only through [its] agents").

     To the extent the parties' submissions spotlight a Montefiore employee, their focus is on

program director Ramachandran, who supervised all anesthesiology residents.  But

Ramachandran did not fire Whitney.  Shaparin, the department's interim chair, did so.  *See*

Schmidt Decl., Ex. 22 (letter of termination).  On appeal, the hearing panel then upheld

Shaparin's decision.  *See id.*, Ex. 46 (report of panel).  To determine, therefore, whether

Montefiore is liable, the Court must first determine whether the evidence would permit a

reasonable factfinder to find that either Shaparin or the hearing panel decided to fire Whitney

because of his disability.  If Whitney cannot show that, the Court must then examine whether unlawful animus on the part of other persons could be found to have so infected the decisions of Shaparin and the panel as to be attributable to Montefiore.

### a.  Evidence as to Montefiore's decisionmakers

For the reasons below, a reasonable factfinder, viewing the evidence in the light most favorable to Whitney, could not find that "the legitimate reasons offered by" Shaparin and the panel for terminating Whitney were "a pretext for discrimination."  *Burdine*, 450 U.S. at 253.

### i.  Shaparin

Whitney's theory of anti-ADHD animus on Shaparin's part is that Shaparin "falsely testified to cover up . . . unlawful conduct."  Pl. Br. at 22.  Specifically, Whitney argues, Shaparin lied under oath about "the involvement of Montefiore's legal department" in the drafting of the ad-hoc committee's report, *id.* at 23 n.169, with the inference being that he lied to conceal such animus.  *See id.* at 35–36.

The evidence, carefully reviewed, does not support (other than by conjecture) that Shaparin lied.  In September 2020, the department's then-chair (Dr. Ellise Delphin) convened an ad-hoc committee to consider the recommendation to dismiss Whitney; Shaparin chaired that committee.  JSF ¶¶ 97–100.  It first agreed to recommend Whitney's immediate dismissal, despite his request for accommodations.  Pl. 56.1 ¶ 262.  After several rounds of edits, however, the committee added a sentence noting that Whitney's termination "may be temporarily delayed" to ensure "all potential accommodations for [his] newly surfaced diagnosis of ADHD are explored."  Schmidt Decl., Ex. 60 at 4; *see* Pl. 56.1 ¶¶ 273–74.  In Whitney's view, Shaparin's explanation of the inclusion of this sentence (which he terms "suspicious") contradicts Delphin's explanation.  Pl. Br. at 16.

In fact, there is no contradiction.  Shaparin testified:

Q:      . . . .  Dr. Shaparin, did someone tell you to put that last sentence in this
        letter?
A:      No.
Q:      . . . [I]t's your position, Dr. Shaparin, that this sentence made it into the last
        letter . . . because you decided at some point to add it, is that what your
        testimony is?
        . . .
A:      The [Ad-Hoc] Committee was concerned this was new information and we
        wanted the Clinical Competency Committee to think about what to do with
        that information.

Shaparin Dep. 118–20 (objections omitted).  For her part, Delphin testified:

Q:      Do you know how that sentence was added?
A:      There was a discussion with [Dr.] Cathy Skae [Montefiore's Vice President
        for Graduate Medical Education] and the hospital lawyers—[sentence
        interrupted due to an objection]
Q:      . . . .  Did you . . . speak to Dr. Skae?
A:      No.
Q:      Okay.  And were you speaking to Montefiore's lawyers?
A:      No.

Delphin Dep. 86–88 (objections omitted).

These excerpts reflect that Shaparin and Delphin were asked distinct questions in their

depositions and that their responses were not incompatible, let alone incompatible in a manner

indicative of a knowing falsehood on Shaparin's part.  Shaparin denied being "told" to put the

sentence in the report; he explained the concerns on the ad-hoc committee's part that had led it to

do so.  Delphin stated, before being interrupted by an objection based on attorney-client

privilege, that she understood that there had been a discussion with Skae and in-house counsel

preceding the addition of the sentence.  For multiple reasons, this testimony does not reveal a

factual contradiction.

First, counsel's questioning did not establish a basis in personal knowledge for Delphin's

understanding that a conversation between Skae and hospital counsel had occurred that in some

manner had led to addition of the sentence. Whitney has not laid a foundation for this testimony

to be received, let alone for the truth of the matter implicit in Delphin's pre-objection answer

(that such a discussion had resulted in adding the sentence). Second, even assuming Delphin had

been competent to report what happened in that conversation, the fact of a discussion between

Skae and counsel does not mean that Shaparin thereafter had been "told" to add the sentence.

The propositions are easily squared: the ad-hoc committee may have acted with input but not an

edict from counsel. Third, even if Delphin had understood counsel to have commanded that the

sentence be added, Delphin's testimony does not establish that Shaparin knew of that command.

Shaparin was not asked about whether he had spoken with in-house counsel, and such an inquiry

would have been improper absent a waiver by Montefiore of attorney-client privilege. And

fourth, relatedly, Whitney's attempt to imply a conflict in testimony between two Montefiore

officials with respect to the tenor or content of the communications between the committee and

in-house counsel is problematic. Questions about such communications could not have been put

to the two witnesses, absent a waiver of privilege by Montefiore, as reflected in the defense's

prompt objection when Delphin's response began to touch on communications with counsel.

Whitney's attempt to impeach Shaparin based on Delphin's brief stray into an area covered by

privilege is not tenable. For these reasons, Whitney has not adduced evidence competent to

establish that Shaparin was untruthful. "[S]peculation or conjecture as to the true nature of the

facts," or as to the truthfulness of deponents, cannot defeat summary judgment. *Knight v. U.S.

Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *see also, e.g.*, *Roge v. NYP Holdings, Inc.*, 257 F.3d

164, 170 (2d Cir. 2001).

     Even assuming the evidence permitted a jury to find a deposition falsehood by Shaparin

with respect to whether counsel directed the addition of a sentence to the letter, that falsehood,

without more, would not give rise to a non-speculative inference that Shaparin terminated

Whitney based on his ADHD.  *See, e.g.*, *Bohlinger v. Abbott Lab'ys Inc.*, 843 F. App'x 374, 380

(2d Cir. 2021) (no triable issue of fact when "discrepancies in [the two decisionmakers'

deposition] testimony with respect to the [adverse action] are . . . variations . . . on the same

theme" and unaccompanied by other evidence of "discriminatory motive"); *Quarless v. Brooklyn

Botanic Garden Corp.*, 611 F. App'x 28, 30 (2d Cir. 2015) (no triable issue of fact when

"inconsistencies and implausibilities were minor and insufficient to permit a reasonable jury to

find that the proffered justification was a pretext for unlawful retaliation"); *Hines v. Hillside

Children's Ctr.*, 73 F. Supp. 2d 308, 316 (W.D.N.Y. 1999) (no triable issue of fact when the

decisionmaker's "minor contradictions" in his deposition related to topics that have "no bearing

on whether [his] stated reason for terminating [the plaintiff] is a pretext").  And Whitney has not

pointed to any other evidence on which a jury could infer anti-ADHD discrimination by

Shaparin.

    *ii. Hearing panel*

   Whitney has not adduced any evidence of discriminatory animus on the part of the

hearing panel.  The panel consisted of five physicians unaffiliated with the department; none, it

appears, had interacted with Whitney before the first hearing.  JSF ¶¶ 150–51; *see* Solotaroff

Decl., Ex. 66 at 3–4 (transcript of Whitney's appearance before the panel).  The record of the

panel's work does not reveal any irregularities; indeed, the evidence is ample and unitary that it

took its duties seriously.  The panel heard sworn testimony over two days from eight witnesses,

JSF ¶¶ 153–54; Def. 56.1 ¶¶ 110–112, each subject to cross-examination, JSF ¶ 155; Def. 56.1 ¶

113.  Members of the panel interjected to put questions to those witnesses to clarify contested

facts and ensure their own understanding of the events preceding Whitney's termination.  *See,

e.g.*, Solotaroff Decl., Ex. 66 at 145, 168 (Whitney); *id.*, Ex. 16 at 74, 96, 138, 206, 218

(Ramachandran); *id.*, Ex. 17 at 9, 12 (Shaparin).  The panel could have revoked Whitney's

termination, JSF ¶ 152; Pl. 56.1 ¶¶ 115–17, but instead unanimously reaffirmed it, finding that he

was unable to "meet the minimum standards for clinical competency" and that the decision to

terminate him had a "sound factual basis," Schmidt Decl., Ex. 46 at 2–4.[7]

The absence of animus on the part of these final decisionmakers is significant.  In *Collins*

*v. New York City Transit Authority*, 305 F.3d 113 (2d Cir. 2002), the Second Circuit addressed a

---

[7] Whitney notes that, before the panel, he defended his performance as "satisfactory"; this, he argues, creates a triable issue of fact as to whether the "poor performance rationale" the panel upheld was pretextual.  Pl. Br. at 32; *see also, e.g.*, Solotaroff Decl., Ex. 66 at 13 (Whitney's testimony before the hearing panel: "I actually felt like I was doing well. . . .  I was doing everything that was expected most days.").  But a plaintiff's subjective assessment of his performance is insufficient to "create an inference of discrimination or constitute proof of pretext."  *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14 Civ. 8202 (LTS), 2017 WL 377936, at *11 (S.D.N.Y. Jan. 25, 2017) (collecting cases); *see also, e.g.*, *Wilson v. N.Y. & Presbyterian Hosp.*, No. 21 Civ. 1971, 2022 WL 17587564, at *2 (2d Cir. Dec. 13, 2022).  That is all the more so when "multiple evaluators all express dissatisfaction with the plaintiff's performance." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012) (Weinstein, J.), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  The question, after all, is not whether Whitney's performance was satisfactory *in fact*; the question is whether Montefiore's decisionmakers *believed it to be*. Evidence that an employer's judgment was subpar "is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."  *Dister*, 859 F.2d at 1116.

For this reason, Whitney's expert declaration from Dr. Edward C. Nemergut II does not give rise to a triable issue on the element of discriminatory intent.  He attests that a "typical residency program" would not have expected Whitney to function as a third-year resident, "[g]iven how much training and experience [he] had missed."  Solotaroff Decl., Ex. 13 at 5.  But even were a jury to credit Nemergut and conclude that Montefiore's expectations of Whitney were too high and its termination decision "objectively incorrect," that, without more, would not demonstrate that Montefiore's "proffered reasons [were] a pretext for termination."  *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012).  To be sure, "evidence which challenges the reasonableness of the employer's decision" can, on rare occasion, "shed[] light on whether the employer's proffered reason for the employment action was its actual motivation." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (cleaned up).  But it is "[o]nly where an employer's business decision is so implausible as to call into question its genuineness [that] this Court [should] conclude that a reasonable trier of fact could find that it is pretextual."  *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010); *see also Dister*, 859 F.2d at 1116 (to create triable issue, plaintiff must adduce evidence that defendant's decision is "so lacking in merit as to call into question its genuineness").  Nemergut's account of how a "typical" program would operate is a far cry from that.

similar situation, in which an "undisputedly independent, neutral, and unbiased" arbitrator had declined to block a termination that the plaintiff claimed was race-based and retaliatory in violation of Title VII. *Id.* at 119. The impartial arbitrator's decision, the Circuit held, was "highly probative of the absence of discriminatory intent." *Id.* The same is true here, where the record does not supply any evidence on which a reasonable factfinder could find the expert panel anything other than impartial.

### iii. Comparator evidence

Whitney argues that an inference of intent to discriminate on the basis of disability can be inferred from Montefiore's treatment of Dr. John Doe, who graduated from the program and does not have ADHD. Such comparator evidence can be "[e]specially relevant" to the pretext inquiry, as it may show that the protected characteristic accounted for the differential treatment of two otherwise alike employees. *McDonnell Douglas*, 411 U.S. at 802; *see Ruiz v. County of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (a "comparator must be similarly situated to the plaintiff in all material respects"). For multiple reasons, however, Doe is not a proper comparator for Whitney, and the comparison does not aid Whitney in opposing summary judgment.

First, as the undisputed evidence shows, the ultimate decisionmakers in Whitney's case (Shaparin and the hearing panel) did not play any part in Montefiore's employment decisions as to Doe. Those occurred in 2018 (when Doe was placed on a two-month remediation plan) and 2019 (when Doe's obstetrics rotation was extended), before Doe's graduation in 2020. Shaparin, who made the decision to terminate Whitney's residency, did not assume the role of interim chair until late 2020. *See, e.g.*, Pl. 56.1 ¶¶ 429–30, 435–44 (cataloguing Doe's feedback until 2019); *see also* Delphin Dep. 73–74. And there is no evidence that members of the hearing panel played any role in addressing (or even knew of) Doe's employment issues. The fact of different

decisionmakers significantly diminishes the value of Whitney's proposed comparator evidence. *See Radwan v. Manuel*, 55 F.4th 101, 136–37 (2d Cir. 2022); *see also Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465–66 (S.D.N.Y. 2006) (collecting cases); *cf. Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) (noting that a but-for inquiry requires changing "one thing at a time [to] see if the outcome changes").

Second, even if the difference in decisionmakers did not defeat the comparison, other factual dissonances do. The timing and duration of the residents' identified deficiencies differ substantially. Doe received critical feedback at the start of his residency; this led Montefiore to require him to repeat his first year, adding six months to his tenure at the hospital. Ramachandran Dep. 20. Whitney's flunks, in contrast, were extended and continued deep into his residency; he was terminated because he had "not demonstrated the ability to consistently perform technically at a [third-year] level," even with accommodations and a three-month reprieve. Schmidt Decl., Ex. 22 at 1. Montefiore gave its new pupil, Doe, an additional chance to succeed; that it did not do the same for a senior resident, whose multiple failings were catalogued over several years, is not probative of animus. A reasonable factfinder could not consider the two residents' divergent paths to bear "a reasonably close resemblance." *Ruiz*, 609 F.3d at 494.

There were also consequential differences in the residents' reported deficiencies. Doe passed the BASIC Exam on his first attempt; Whitney failed three times over two years. *See* JSF ¶¶ 51, 87, 116; *see also, e.g.*, *Coku v. N.Y. Presbyterian Hosp.*, No. 17 Civ. 2488 (PKC), 2019 WL 3779507, at *9 (S.D.N.Y. Aug. 12, 2019) (defendant's poor exam performance precluded use of comparator evidence). The residents' professionalism challenges also differed. Doe had periodic attendance issues and once made a failed "attempt[] to conceal" the misplacement of an

intrathecal catheter.  Pl. 56.1 ¶¶ 429–30, 435.  The more senior Whitney had amassed a longer

list of different (and arguably materially more serious) demerits, including a 44% drug-

discrepancy rate, compared to the departmental average of 5%, *see, e.g.*, Def. 56.1 ¶¶ 26–27;

commission of the "fireable offense" of amending notes in a patient's record without permission,

Schmidt Decl., Ex. 43 at 1; and failure to adhere to "basic principles of professionalism,"

including by "pre-charting physical exams before seeing the patient," *id.*, Ex. 40 at 1.  Where a

plaintiff's deficiencies are "objectively more serious than that of a proposed comparator,

differential treatment by the employer does not create an issue of fact that will defeat a motion

for summary judgment."  *Conway*, 414 F. Supp. at 464 (collecting cases); *see also, e.g.*, *Graham*

*v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (comparator must have engaged in

"comparable conduct" of "comparable seriousness"); *Radwan*, 55 F.4th at 132 (same).  Just so

here.

Doe's experience at Montefiore thus does not supply an "objectively identifiable basis for

comparability."  *Graham*, 230 F.3d at 40.  It does not elucidate the basis for Whitney's

termination, let alone support the inference that Whitney was terminated on account of his

ADHD.  To draw an inference of disability discrimination based on this comparison "would

require speculation . . . that is simply not supported by the record."  *Gambrell v. Nat'l R.R.*

*Passenger Corp.*, No. 01 Civ. 6433 (NRB), 2003 WL 282182, at *7 (S.D.N.Y. Feb. 3, 2003).

### b.  Evidence as to other Montefiore employees

For Whitney's claims to survive summary judgment, he must, therefore, rely on the

asserted discriminatory animus of lower-level employees who did not themselves make the

decision to terminate him.  Whitney thus pursues a theory known as "cat's paw" liability, under

which a lower-level employee's discriminatory intent is imputed to the final decisionmaker and

thus to the employer as a whole.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011).[8]  Under a cat's paw theory, an employer is liable if "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action."  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016).

The Second Circuit has not resolved whether a cat's paw theory of liability is viable under the ADA and Rehabilitation Act.  The Supreme Court has approved this liability theory in connection with statutes with a "lenient mixed-motive causation standard," but has not opined on whether it may be used in applying statutes (like those here) requiring but-for causation. *Natofsky v. City of New York*, 921 F.3d 337, 350 (2d Cir. 2019); *see Gentleman v. State Univ. of N.Y.*, No. 21 Civ. 1102, 2022 WL 1447381, at *4 (2d Cir. May 9, 2022) (terming this an open question).  Some lower courts have expressed doubt on its applicability to claims under such statutes.  *See, e.g.*, *Gentleman v. State Univ. of N.Y.*, No. 16 Civ. 2012 (JMA), 2021 WL 8013819, at *10 n.2 (E.D.N.Y. Mar. 31, 2021), *aff'd*, No. 21 Civ. 1102, 2022 WL 1447381 (2d Cir. May 9, 2022); *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 129 (D. Conn. 2020); *Natofsky v. City of New York*, No. 14 Civ. 5498 (NRB), 2017 WL 3670037, at *12 (S.D.N.Y. Aug. 8, 2017), *aff'd*, 921 F.3d 337 (2d Cir. 2019).

---

[8] The metaphor derives from one of Aesop's fables, in which a "monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing."  *Staub*, 562 U.S. at 416 n.1.  As applied in the employment context, "by merely effectuating or 'rubber-stamping' a discriminatory employee's 'unlawful design,' the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned—i.e., successfully sued." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (cleaned up).

On this conceptual question, this Court is less skeptical.  There is no charter in the text of the ADA and Rehabilitation Act (and comparable statutes) for a bright-line rule that would preclude liability on this theory.  And for three reasons, this Court's assessment is this theory, on proper evidence, could support liability under the ADA and Rehabilitation Act for discriminating against a qualified individual "on the basis of" a disability.

First, the Second Circuit has upheld use of this theory in a retaliation claim under Title VII, which also requires but-for causation.  *See Vasquez*, 835 F.3d at 272–73 & 272 n.4 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  It would be inconsistent to allow the cat's paw theory in one but-for context and disallow it in another.

Second, it is easy to posit scenarios in which a lower-level employee's animus was a but-for cause of a termination, as the ADA and Rehabilitation Act require.  Consider, for example, an intermediate supervisor who is tasked with recommending the termination of one of her direct reports as part of a cost-reduction plan, and—acting out of discriminatory animus—selects a disabled subordinate who would not otherwise have been targeted for termination.  On these facts, the final decisionmaker's rubber-stamp ratification of this recommendation does not alter the fact that the "trait actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (cleaned up); *see, e.g.*, *Nassar*, 570 U.S. at 346–47.  Of course, if the final decisionmaker had her "own unbiased reasons that were sufficient in themselves to justify termination," the bias of an intermediate participant would not support liability.  *See Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 950 (10th Cir. 2011).  But that presents a question of fact; it does not support a categorical bar.

Third, as a matter of business reality, authority within an employer "to reward, punish, or dismiss is often allocated among multiple agents." *Staub*, 562 U.S. at 420; *see also Shager*, 913 F.2d at 404–05. Deferential approvals of recommended promotion and termination decisions have the capacity to embed biases by intermediate officials. *See Hinton v. City Coll. of N.Y.*, No. 05 Civ. 8951 (GEL), 2008 WL 591802, at *17 (S.D.N.Y. Feb. 29, 2008). An inflexible rule precluding liability on a cat's paw theory no matter the circumstances would give an "unlikely meaning to a provision designed to prevent employer discrimination." *Staub*, 562 U.S. at 420.

In the end, however, this case presents no need to settle this doctrinal question. Even assuming cat's paw liability is viable under the ADA and Rehabilitation Act, Whitney has not adduced evidence on which a reasonable factfinder could find that his supervisors at Montefiore harbored animus towards his ADHD; much less that such was a but-for cause of the termination decision reached by Shaparin and approved by the hearing panel. Whitney points to four tranches of evidence that he contends evince animus by his supervisors. The Court evaluates each in turn, and then reviews "the evidence as a whole." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997). Neither separately nor together do these present a triable issue of fact.

### i.   *Whitney's duties*

Whitney argues that the duties with which Montefiore entrusted him belie its performance critiques. Until his termination, he notes, he was permitted to serve on-call with "double covered" supervision, and had such duties even on fraught nights when no more than a "skeleton crew" was present, Kim Dep. 103. As program director Ramachandran testified: "[T]hings happen at night, [and] there's only one resident, one attending." Ramachandran Dep. 200. Given these responsibilities, Whitney argues, a factfinder could deem pretextual

Ramachandran's assessment that Whitney could not "exercise the responsibilities of a senior resident."  Pl. Br. at 27.

But the evidence to which Whitney points cannot bear that weight.  It is undisputed that even first-year residents had these same responsibilities: they were permitted, after an initial four-week period, to take on-call shifts and work double covered.  *See, e.g.*, Ramachandran Decl. ¶ 10; *see also* Pl. 56.1 ¶¶ 149–54.  That Ramachandran entrusted Whitney with responsibilities assigned to even Montefiore's newest residents does not undermine—let alone expose as pretext for disability discrimination—her assessment that Whitney could not perform the elevated responsibilities of a senior resident.

*Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29 (2d Cir. 1994), on which Whitney relies, is thus inapposite.  The Second Circuit there found a factfinder could infer animus where an employer's stated rationale for termination was at odds with its actions.  *See id.* at 38–39.  The defendant had argued the plaintiff "was in fact not capable of performing the duties" of his role but had in fact kept him in that role "for nearly nine months" and given him "a three percent raise."  *Id.* at 39.  Here, however, Montefiore, in terminating Whitney, did not claim he could not perform as a first-year resident; on the contrary, attendings often told him he "do[es] fine with . . . simple low-risk cases."  *See, e.g.*, Schmidt Decl., Ex. 43 at 2 (feedback dated January 13, 2021).  Ramachandran's performance critiques of Whitney were based on Whitney's reported lapses, as reviewed above, which, far from being out of step with her recommendation of termination, were entirely consistent with it.[9]

---

[9] For this reason, the expert testimony of Dr. Patricia Mack does not sustain Whitney's case.  She opines that a "typical anesthesiology residency program would not allow a resident to continue to be double covered or placed on call if it was concerned the resident could not safeguard the safety of patients."  Solotaroff Decl., Ex. 12 at 6.  Few attendings within Montefiore, it appears, believed Whitney's mere presence endangered patients, at least when supervised on double

>    ii.    *Montefiore employees' alleged efforts to manufacture pretext*

Whitney next argues that Montefiore senior staff were "caught in the act of creating pretext" throughout his tenure.  Pl. Br. at 28.  He cites three discrete incidents, which the Court reviews in turn.

First, he points to an early 2021 email from Ramachandran to a colleague stating that Whitney "[c]learly . . . is not succeeding and . . . cannot graduate but we need to prove our case." Solotaroff Decl., Ex. 53 at 1.  Whitney argues that a juror could infer from this statement that Ramachandran was not acting in good faith, that her critiques of Whitney's performance were a ruse to facilitate his dismissal (rather than a genuine evaluation of his strengths and weaknesses), and that behind this ruse lay anti-ADHD animus.  Pl. Br. at 16.

Viewed in the light most favorable to Whitney, Ramachandran's statement cannot bear this weight, as is clear viewing the statement in full context.  An anesthesiology attending had emailed Ramachandran, supplying negative feedback on Whitney's performance and asking her: "What are we doing about evaluations for Ryan Whitney at this point?"  Solotaroff Decl., Ex. 53 at 1.  Ramachandran replied:

> Would you be ok resending this to me copying Ryan on it?  The hospital lawyers are trying to work about a resolution with Ryan's lawyers.  Clearly he is not succeeding and he cannot graduate but we need to prove our case.

*Id.*  Even "draw[ing] all permissible factual inferences in favor of" Whitney, *Johnson*, 680 F.3d at 236, only by speculation could one derive from this email bias on the basis of disability.

---

coverage.  And, as discussed in footnote 7, *supra*, the question is not what a typical program would do, nor what Montefiore should have done; the question is what its employees believed. *See, e.g.*, *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 641 (2d Cir. 1986) (an "employer need not prove . . . that it made the wisest choice, but only that the reasons for [its] decision were nondiscriminatory").  As with Whitney's other expert, Nemergut, Mack's focus on what a "typical" program would do does not support the conclusion that Ramachandran's rationale was "so lacking in merit as to call into question its genuineness."  *Dister*, 859 F.2d at 1116.

Whitney does not offer any concrete basis to read the email as meaning other than what it says: that she had concluded that Whitney was "clearly not succeeding" and "cannot graduate," Solotaroff Decl., Ex. 53 at 1; *see* Ramachandran Dep. 465 ("[A]s of that particular day, he's not succeeding and he cannot graduate if he continued that way."). With legal counsel for Whitney having surfaced, that Ramachandran sought "to prove [her] case" that he was "not succeeding" does not give rise to an inference "that discrimination was the real reason" for his termination. *Hicks*, 509 U.S. at 515.

Second, Whitney points to Ramachandran's decision, two months after the incident, to solicit feedback about the December 2020 cleft-palate surgery in which a pediatric patient's breathing tube became dislodged. Whitney notes that at the time, the attending anesthesiologist told him he had performed at a level commensurate with his experience. Solotaroff Decl., Ex. 38 at 1. Two months later, Ramachandran solicited feedback from the surgeon, who criticized Whitney's "failure to react in an expeditious manner." *Id.*, Ex. 63 at 1. Ramachandran interpreted this to mean that Whitney "endangered the patient." Ramachandran Dep. 490. Whitney notes that Ramachandran did not share the surgeon's feedback with Whitney, place him on single coverage, alter his on-call schedule, or file a patient-safety report in Montefiore's "near-miss" system. Ramachandran Dep. 490–95. Instead, Whitney states, Ramachandran "kept the negative feedback in [her] proverbial pocket . . . before pulling it out to place it in" his termination letter. Pl. Br. at 28.

The inference does not logically follow that Ramachandran solicited this feedback out of anti-ADHD animus. That Ramachandran sought feedback about this disquieting incident amid Whitney's ongoing performance issues, and that Ramachandran cited this feedback at the time of the termination decision, does not bespeak irregularity indicative of illicit motives. Nor, without

more, would the gap between the procedure and Ramachandran's request for feedback give rise to an inference of such bias.  Such an inference also would not logically arise from that fact that Ramachandran did not personally discuss this incident with Whitney.  As she testified, she was not Whitney's direct supervisor, and she expected "[p]eople would have discussed it with Dr. Whitney as when things happened, so I assumed Dr. [Mark] Teen [one of the attending surgeons] had discussed it with Dr. Whitney on the date of the case."  Ramachandran Dep. 486.  In any event, even were the jury to discredit Ramachandran's explanations and to infer that she had acted upon personal hostility towards Whitney, there is no non-speculative basis to infer that this animus derived from Whitney's ADHD.  *Cf. Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997) ("spite[] or personal hostility" does not imply discrimination based on a protected characteristic).  And to the extent that Whitney's grouse is not with the request for feedback from the surgeon but with the substance of that feedback, he does not give a reason to infer that the surgeon's negative assessment was insincerely held.

Third, Whitney turns to two early-2021 emails about Whitney that Ramachandran received from Dr. Jay Berger, associate director of Montefiore's intensive care unit.  He characterizes Berger's second email as more negative; he thus argues that the inference can be drawn that, between the two emails, "the program decided to evaluate him negatively to justify his termination."  Pl. Br. at 28 n.175.

A reasonable factfinder could not view the emails as indicative of discriminatory animus. The first email arose after Ramachandran, in January 2021, emailed Berger:

> Ryan successfully completed both his ICU rotations.  He performed better in ICU than he did in the OR based rotations.  Also, he performed well in [post-anesthesia care unit].  If we were to try and find a position for Ryan in a different specialty, would you be willing to put in a good word for him?

Solotaroff Decl., Ex. 52 at 1.  Berger replied, in full: "I would be willing to say he did a good job in the ICU, yes."  *Id.*  The second email arose in the course of a standard evaluation.  In February 2021, he wrote Ramachandran:

> The consensus is that Ryan is a below-average senior resident.  He seems to interact well with the other house staff and nurses. . . .  My biggest concern which is shared by Dr. Emple is his apparent uneasiness with procedures. . . .  An additional problem is his lack of professionalism. . . .  On a positive note, Dr. Malik pointed out that Rayn [sic] interacted very well with family members of patients that were actively dying and helped them through that process.

Schmidt Decl., Ex. 71 at 1.  Even viewing this evidence in the light most favorable to Whitney, there is little daylight between the two emails.  In the first, Berger, responding to the observation that Whitney had performed better in the ICU than elsewhere, said he would be "willing to say he did a good job in the ICU"—a tersely positive, but not glowing, appraisal.  In the second, Berger gave a mixed review, identifying negatives and positives, while noting the "consensus" that "Ryan is a below-average senior resident."  There is no inconsistency between these emails, let alone a basis upon which to conclude that Berger's second assessment was insincere and masked anti-ADHD animus on his part.

   *iii.*  *Montefiore's evaluation of Whitney as a third-year resident*

   Whitney next argues that Ramachandran (and the CCC, which recommended Whitney's termination) deviated from standard procedures in assessing whether he was "functioning at a [third-year] level."  Pl. Br. at 28 & n.175.  Whitney contends that this benchmark was created for his case in order to rationalize his termination.  Pl. Br. at 28.  Whitney argues that "Montefiore's evaluation policy does not provide for evaluating residents this way, and neither does Montefiore's standard New Innovations evaluation system," which "evaluated residents on a scale of 1 to 5."  Pl. Br. at 28–29.  Relatedly, he adds that the CCC "is not supposed to be involved in termination decisions."  Pl. Br. at 23.

Whitney, however, stipulated otherwise.  Before the parties filed their briefs on summary judgment, they stipulated that the CCC is tasked with "determining a resident's progress" and "recommending remediation, probation, disciplinary action, or termination of residents."  JSF ¶ 23.  They further stipulated that "[t]he CCC meets . . . to evaluate each resident's progress in achieving the milestones based on each resident's level of training and to determine if the resident should receive credit for the prior six months."  JSF ¶ 24.  "Factual stipulations are binding and conclusive, and the facts stated are not subject to subsequent variation."  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 677 (2010) (cleaned up).  The stipulations here commit Whitney to the proposition that Montefiore's residents were evaluated based on their level of training, and that the CCC was responsible for so evaluating them.  That stipulation was consistent with deposition testimony of various attending physicians.  *See, e.g.*, Straker Dep. 87–88 ("All [third-year] residents are evaluated on [third-year] milestones."); Rufino Dep. 53 ("[F]aculty . . . expect [residents] to be performing at their training year."); Osborn Dep. 37 ("[Training year is] a criteria that we use . . . .").  Whitney's assertion that the evaluation process was jerry-rigged against him thus is factually unsupported and does not advance his claim of pretext.[10]

---

[10] In his brief's statement of facts, but not in his argument, Whitney claims that the processes Montefiore used with respect to him were irregular in other respects.  He asserts, for example, that Ramachandran used specialized evaluation forms to evaluate his progress, JSF ¶ 40; Pl. 56.1 ¶¶ 203–04, 298; that the ad-hoc committee's composition violated Montefiore policy, JSF ¶ 100; Pl. 56.1 ¶¶ 249–51; and that relevant information was not placed before the ad-hoc committee, Pl. 56.1 ¶¶ 257–60.  But "mere deviations from policy, or a disagreement about how to apply company policy, do not show pretext."  *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 459 (5th Cir. 2019); *see also, e.g.*, *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.").  The plaintiff "must connect a departure from or misapplication of procedure to a

*iv.*     *The alleged false testimony of Montefiore's witnesses*

Whitney notes that Ramachandran and associate program director Kim testified in their depositions that they had not known of Whitney's ADHD diagnosis until after the September 2020 CCC meeting.  Pl. Br. at 35; *see* Ramachandran Dep. 91; Kim Dep. 79–80.  In fact, Whitney states, that was false.  In an October 2018 email forwarded to Ramachandran and Kim, Whitney had written, "I have had ADHD my entire life," and stated that he had discussed having ADHD with Ramachandran in a meeting just the day before.  Solotaroff Decl., Ex. 25 at 3. Whitney argues that Ramachandran and Kim lied under oath in denying earlier knowledge of Whitney's ADHD, and that their false denial should give rise to the inference that they acted out of anti-ADHD bias in supporting his termination.

Although Ramachandran denied ever discussing Whitney's ADHD with him, and both she and Kim denied recalling the October 2018 email during the events that followed, the Court assumes *arguendo* for purposes of this motion that Ramachandran and Kim lied about this point in their depositions.  In other words, the Court assumes that Ramachandran and Kim read the October 2018 email and, during the rest of Whitney's tenure at Montefiore, recalled the portion of it in which Whitney stated that he had ADHD.

Alone among Whitney's claimed evidence of pretext, this evidence relates to his ADHD. As such, it is, the Court assesses, Whitney's strongest evidence.  Nonetheless, these denials do not give rise to an inference that anti-ADHD animus motivated Whitney's termination.  Federal antidiscrimination law "is not," after all, "a cause of action for perjury."  *Hicks*, 509 U.S. at 521. In general, more than a litigation falsehood is needed for an inference of earlier employment discrimination to arise sufficient to survive summary judgment.  A "plaintiff cannot seek to

---

discriminatory motive."  *McMichael*, 934 F.3d at 460.  Whitney has not done so here with respect to the limited, and banal, deviations from procedure that he cites.

39

expose [an employer's] rationale as pretextual by focusing on minor discrepancies that do not

cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."

*Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).  Otherwise, baseless cases—

ones with threadbare proof of discriminatory intent—would clear summary judgment provided a

claimant raised a dispute of fact about whether an employer's deposition contained a knowing

falsehood.  *See, e.g.*, *Quarless*, 611 F. App'x at 30 (upholding entry of summary judgment for

defense when "inconsistencies and implausibilities" in decisionmaker's deposition "were minor

and insufficient," in light of other evidence, "to permit a reasonable jury to find that the proffered

justification was a pretext"); *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 169 (D.D.C. 2018)

(granting summary judgment when the "inconsistencies in the [decisionmakers' depositions]

have nothing to do with the reasons for [the plaintiff's] termination"); *cf. Risco v. McHugh*, 868

F. Supp. 2d 75, 104 (S.D.N.Y. 2012) ("[e]ven if" a witness "did exaggerate or lie about [the

plaintiff's] conduct or performance, there is no evidence in the record to support a finding that

[he] did so in order to conceal any prohibited motivation").

　　　For multiple reasons, drawing such an inference based on the limited assumed deposition

falsehoods here would be particularly unwarranted.  First, before October 2018, issues with

Whitney's competence had already been documented; these significantly prefigured his later

documented performance issues.  *See, e.g.*, Solotaroff Decl., Ex. 25 at 2 (describing Whitney as

easily "flustered" and "fail[ing] to react in times of emergency").  Indeed, the very reason

Ramachandran met with Whitney in October—at which time Whitney allegedly told her of his

ADHD—was to discuss this negative feedback.  *See* Schmidt Decl., Ex. 23 at 1.  Second, far

from then turning against Whitney, Ramachandran and Kim, after receiving the October 2018

email that put them on notice of Whitney's ADHD, demonstrably assisted Whitney's cause,

giving him "positive comments" and removing him from the remediation plan.  Schmidt Decl.,

Ex. 50 at 2; *see also, e.g.*, Solotaroff Decl., Ex. 98 at 2 (minutes from CCC meeting in June

2019, noting Whitney had "[i]mproved" and had done a "good job" on a rotation).  Third, and

most important, as chronicled above, a range of diverse deficiencies were cited in support of

Whitney's termination, including failings reported by a wide array of Montefiore personnel (*e.g.*,

physicians who observed his performance during surgery) and failings that were objectively

demonstrable (his repeated flunking of the BASIC Exam).  And Whitney has not adduced any

evidence of anti-ADHD hostility by any Montefiore personnel, or even circumstantial or indirect

evidence from which such an inference might arise.

*v.     Viewing the evidence as a whole*

The Court next "examine[s] the entire record" to "make the case-specific assessment as

to whether a finding of discrimination may reasonably be made."  *Zimmermann v. Assocs. First

Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001).  As the Supreme Court has explained, "[w]hether

judgment as a matter of law is appropriate in any particular case will depend on a number of

factors," including the "probative value of the proof that the employer's explanation is false," the

"strength of the plaintiff's *prima facie* case," and the strength of the employer's case.  *Reeves*,

530 U.S. at 148–49.  "[A]n employer would be entitled to judgment as a matter of law . . . if the

plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and

there was abundant and uncontroverted independent evidence that no discrimination had

occurred."  *Id.* at 148.

There is no triable issue here.  "[A] reason cannot be proved to be a 'pretext for

*discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the

real reason."  *Hicks*, 509 U.S. at 515 (emphasis in original).  There is abundant evidence

supporting Montefiore's valid—nondiscriminatory—bases to terminate Whitney.  These include

41

Whitney's three-time failure of the BASIC Exam, *see* JSF ¶ 51, 87, 116, his missteps during several rotations, *see* JSF ¶ 53, 75, 135, and his mismanagement of patient records, *see* Def. 56.1 ¶ 63.  Those bases were sustained by the independent panel of five physicians who reviewed the evidence, heard live testimony, and upheld the termination.  *See* JSF ¶¶ 153–55; Def. 56.1 ¶ 113.  On the other side of the ledger, there is no evidence in the record whatsoever, direct or circumstantial, that Whitney's disability played any role in the dismissal.  There is thus not even a weak issue of fact in this case.  And even if there were a weak issue of fact as to the objective basis for some of Montefiore's rationales, given the hefty record of varied reasons for dismissal, no rational factfinder could conclude that the real basis was discrimination.  "It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."  *Reeves*, 530 U.S. at 147 (quoting *Hicks*, 509 U.S. at 519); *see also, e.g.*, *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir. 2000).  Whitney has not adduced evidence to that effect here.

The absence of "proof that the employer's explanation is false" readily distinguishes this case from disparate-treatment cases that went to trial.  *Reeves*, 530 U.S. at 149.  Three precedents illustrate the distinction.  In *Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013), the defendant first put forward one explanation for the plaintiff's dismissal (a shift in its business focus), but once the litigation was underway, its CFO "directly contradict[ed]" that explanation in favor of a new one (the plaintiff's poor performance on various projects).  *Id.* at 846–47.  Those "shifting" explanations, viewed alongside the "very close temporal proximity" (three weeks) between the plaintiff's "protected conduct and her termination," "create[d] a triable issue of fact" whether the reasons for the termination were pretexts for retaliation.  *Id.* at 847.  In *Stern v. Trustees of Columbia University*, 131 F.3d 305 (2d Cir. 1997), Columbia University "claimed

to have made its selection" of a director of its Spanish language program "based principally" on the candidates' "relative teaching skills . . . as exhibited in classes conducted entirely in Spanish." *Id.* at 313.  But "a majority" of the university's search committee "concededly could not understand" Spanish.  *Id.*  That contradiction, combined with admissions by members of the search committee that the department "needed more Hispanic members," and that the plaintiff, a white male of Eastern European origin, was "not going to be seriously considered for this job," created a "genuine issue[] of fact to be tried" as to its motives.  *Id.* at 311, 314.  Finally, in *Walsh v. New York City Housing Authority*, 828 F.3d 70 (2d Cir. 2016), the New York City Housing Authority had never hired a female bricklayer and its decisionmaker relied on a "sex-based stereotype" to justify his refusal to hire the plaintiff.  *Id.* at 80.  That, too, created a triable question as to animus.

In each of these cases, the plaintiff came forward with sufficient evidence both to rebut the employer's rationale *and* to offer a discernable causal link between the adverse action and his or her protected status.  Here, however, Whitney has neither rebutted Montefiore's rationale nor offered any causal link between his termination and his disability.  Montefiore has adduced weighty evidence of legitimate justifications for terminating his residency; Whitney has not offered "hard evidence" to show that his claim—that hospital officials acted out of hostility to his ADHD—is anything other than "wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  The assembled record supports just one inference: that Montefiore's staff terminated Whitney based on his performance and not based on his disability.  There being no genuine dispute of material fact on the element of discriminatory intent, the Court enters summary judgment for Montefiore on Whitney's disparate-treatment claim.

### B.      Retaliation

#### 1.      Legal Standards

Under the ADA and the Rehabilitation Act, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made unlawful by [the acts] or because such individual . . . made a charge, testified, assisted, or participated in any manner in" a proceeding under those acts.  42 U.S.C. § 12203(a) (ADA); *see also Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 148–49 (2d Cir. 2002) (applying same standard to ADA and Rehabilitation Act retaliation).

Courts analyze retaliation claims under these statutes using the same *McDonnell Douglas* framework reviewed above.  *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  To make out a *prima faci*e case, a plaintiff must establish that: (1) he or she participated in a protected activity; (2) the employer was aware of this activity; (3) the employer thereafter took materially adverse employment action against him or her; and (4) there was a causal connection between the protected activity and the adverse employment action.  *See id.*  Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *See id.* at 721.  If the defendant meets this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

#### 2.      Discussion

The parties agree that Whitney's retaliation claim rises or falls with his disparate-treatment claim.  Both parties brief the issues as coextensive.  And Whitney does not offer

independent evidence or analysis in support of the retaliation claim.  *See, e.g.*, Pl. Br. at 24–31 (offering no separate analysis of retaliation claim).

The Court nonetheless briefly independently assesses the evidence as to that claim.  As to the first element, although Whitney's retaliation theory is thinly addressed, he appears to allege two protected activities: his initial request for accommodations and his filing of a complaint with the EEOC, both in October 2020.  *See* JSF ¶¶ 111, 119.  These activities qualify as protected. *See, e.g.*, *Weixel*, 287 F.3d at 149 (requests for accommodations are protected activity); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (complaints based on good faith belief that employer is violating ADA are protected activity).

Whitney's retaliation claim, however, founders at the same point in the *McDonnell Douglas* analysis as his disparate-treatment claim.  There is no indication that a reasonable factfinder could conclude that his termination was retaliatory.  In terms of the timing of Whitney's termination, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  "Were it otherwise, an employee concerned about the risk of an adverse action could forestall the action—and effectively hamstring his employer—with an artfully timed request for accommodation or complaint about discrimination."  *Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 10288 (LJL), 2023 WL 171888, at *24 (S.D.N.Y. Jan. 11, 2023); *see also, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (an employer's decision to "proceed[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").  Here, it is undisputed that the negative performance-related feedback that ultimately brought about Whitney's termination in April 2021 long predated his protected activities; indeed, these

activities (Whitney's request for accommodations and filing of the EEOC claim) were *precipitated* by Montefiore's initial decision to terminate his employment in October 2020. *See* Solotaroff Decl., Ex. 37 at 2–3 (Whitney's EEOC complaint: "I [have been] summarily suspended from my training and duties . . . and I remain suspended"). The timing of events here does not give rise to an inference of a retaliatory termination. And Whitney has not pointed to other evidence (direct or circumstantial) indicating that the termination decision was made to retaliate for these acts.

And, for the same reasons covered in connection with Whitney's disparate-treatment claim, there is no indication that the nondiscriminatory rationales for his termination were pretexts for retaliation. The evidence, chronicled above, is instead overwhelming that the termination decision, made by neutral decisionmakers and untainted by any unlawful animus by other Montefiore employees, was on the merits. And Montefiore's actions after Whitney's protected activities are inconsistent with a theory of retaliation. When Whitney requested accommodations, Montefiore agreed to accommodate him, and to suspend his termination for a period of time to give him a final opportunity to perform. This sequence of events is the antithesis of one suggestive of retaliatory motivation. *See, e.g.*, *Hardy v. Pepsi Bottling Co. of N.Y., Inc.*, No. 14 Civ. 4007 (VEC), 2016 WL 1301181, at *10 (S.D.N.Y. Mar. 31, 2016), *aff'd*, 690 F. App'x 60 (2d Cir. 2017).

There being no evidence that the reasons given for Whitney's termination were pretexts to cover for retaliation for his protected activities, the Court enters summary judgment for Montefiore on Whitney's retaliation claim.

C.      **Failure to Accommodate**

1.      **Legal Standards**

Under the ADA, to "discriminate against a qualified individual on the basis of disability"

includes "not making reasonable accommodations to the known physical or mental limitations of

an otherwise qualified individual with a disability who is an applicant or employee, unless such

covered entity can demonstrate that the accommodation would impose an undue hardship on the

operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  The same is true

for the Rehabilitation Act.  *See, e.g.*, *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995).

"Where, as in this case, a . . . plaintiff [with a disability] claims that he can perform a particular

job with a reasonable accommodation, the *prima facie* burden requires a showing that (1)

plaintiff is a person with a disability [within the meaning of the relevant statues]; (2) an employer

covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff

could perform the essential functions of the job at issue; and (4) the employer has refused to

make such accommodations."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118

(2d Cir. 2004).  Where a *prima facie* case is made out, the burden shifts to the employer, who

may defend on the grounds that the accommodation would have worked an undue hardship.  *See,*

*e.g.*, *Stone v. City of Mount Vernon*, 118 F.3d 92, 98–99 (2d Cir. 1997).

Unlike a disparate-treatment claim, which turns on the employer's motives, a failure-to-

accommodate claim does not "require proof of discriminatory intent."  *Brooklyn Ctr. for*

*Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co.*, 955 F.3d 305, 312 (2d Cir. 2020); *see also,*

*e.g.*, *Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20 Civ. 10288 (LJL), 2023 WL 171888, at

*33 (S.D.N.Y. Jan. 11, 2023).  "It follows inexorably that the *McDonnell Douglas* scheme is

inapposite in respect to such claims."  *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252,

264 (1st Cir. 1999); *accord, e.g.*, *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th

Cir. 2021), *cert. denied*, 142 S. Ct. 767 (2022). The *McDonnell Douglas* framework is designed,

after all, to "sharpen the inquiry into the elusive factual question of *intentional discrimination*."

*Burdine*, 540 U.S. at 255 n.8 (emphasis added). But "[i]n a reasonable-accommodation case, the

'discrimination' is framed in terms of the [employer's] failure to fulfill an affirmative duty—the

failure to reasonably accommodate the disabled individual's limitations"—rather than in terms of

the employer's "invidious discriminatory intent." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir.

2004). The focus thus is not on the employer's motives, but on the nature of accommodations

offered, and whether the plaintiff is a qualified individual within the meaning of the applicable

statute. *See Rodal*, 369 F.3d at 118; *see also Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir.

2017) (at summary judgment, a court must "determine whether the various parties have advanced

sufficient evidence . . . to prove or disprove the reasonableness of the accommodations offered or

not offered").

### 2.    Discussion

As with his earlier claims, there is no dispute on this motion as to the first three prongs of

the *prima facie* case: Whitney's ADHD qualifies as a disability; Montefiore had notice of his

disability; and the Court assumes *arguendo* that Whitney could perform the essential functions of

his job as a senior resident with reasonable accommodations. The parties' dispute thus centers

on the fourth prong—whether Montefiore refused to make reasonable accommodations.

The parties give limited attention to this claim in their briefs. In moving for summary

judgment, Montefiore contends that to the extent that Whitney requested accommodations, it

reasonably accommodated him, and that Whitney's termination reflected his inability, even with

accommodations, to perform up to the hospital's standards. Def. Br. at 34. As to Whitney,

although he broadly declares that Montefiore never accommodated him at all, in opposing

Montefiore's motion, he argues that the hospital did not "actually provide[] the accommodations

it promised." Pl. Br. at 37. This, he contends, gives rise to a "clear issue of fact" that precludes

summary judgment. Pl. Br. at 36–37 & n.183.

But the relevant question is not whether Montefiore provided Whitney with *all* of his

proposed accommodations. The ADA and Rehabilitation Act "do[] not require the employer to

provide every accommodation the disabled employee may request, so long as the [ultimate]

accommodation provided [by the employer] is reasonable." *Fink v. N.Y.C. Dep't of Personnel*,

53 F.3d 565, 567 (2d Cir. 1995); *see also, e.g.*, *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir.

1996). "[I]n a case such as this, in which the employer has already taken (or offered) measures

to accommodate the disability, the employer is entitled to summary judgment if, on the

undisputed record, the existing accommodation is 'plainly reasonable,'" whether or not those

existing accommodations align with the employee's proposal. *Noll v. Int'l Bus. Machines Corp.*,

787 F.3d 89, 94 (2d Cir. 2015). A reasonable accommodation "enable[s] an individual with a

disability who is qualified to perform the essential functions of that position . . . [or] to enjoy

equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). When the

employer's "existing accommodation" is "plainly reasonable," that "ends the analysis," and there

is "[t]here is no need . . . to consider whether the employee's requested accommodation would

[also] have been reasonable" or "engage in further burden-shifting." *Noll*, 787 F.3d at 94.

On this record, a factfinder could find only that Montefiore's accommodations were

plainly reasonable. It is undisputed that Whitney received substantial accommodations. Most

obviously, Montefiore suspended his termination for three months, JSF ¶¶ 108, 112, to give him

an additional chance to "demonstrate that he can meet the requirements of his position," Schmidt

Decl., Ex. 34 at 9.  In addition, over the course of those three months, he was assigned, upon his request, an additional one-month ICU rotation, so he could showcase his skills in a field in which he felt more confident, JSF ¶ 139; *see also* Whitney Dep. 199; he was allowed to bring checklists into the operating room to aid his organizational skills, D. 56.1 ¶ 54; Pl. 56.1 ¶ 54; he was assigned a designated mentor, JSF ¶ 115; he was given protected breaks at lunch time to collect his thoughts and prepare for his afternoon "flow of cases," Whitney Dep. 203–04; and he received feedback "most days" from attendings with whom he worked, Whitney Dep. 203.

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," *Noll*, 787 F.3d at 94, the evidence here would not permit a jury to find these accommodations insufficient to allow Whitney to "perform the essential functions" of his post, 29 C.F.R. § 1630.2(o)(1)(ii).  On the contrary, Montefiore surpassed its legal obligations in suspending Whitney's termination in the first place, as "[n]othing in the ADA demands that an employer accord an employee—even an employee with a disability—such a second chance." *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 66 (1st Cir. 2020); *see also, e.g.*, *McElwee v. County of Orange*, 700 F.3d 635, 641 & n.4 (2d Cir. 2012) (no requirement for an employer to "excuse[] past misconduct").  Moreover, Montefiore altered its procedures as he requested, targeting his specific ADHD-related concerns; he received daily feedback forms giving him guidance as to his "[t]ime management" and "[t]ask prioritization," and used a "written task list" in the operating room to keep him on track.  Schmidt Decl., Ex. 35 at 2.  Notwithstanding Whitney's critiques, these accommodations gave Whitney the chance to perform the "essential functions" of his position. *See, e.g.*, *Alexidor v. Donahoe*, No. 11 Civ. 9113 (KMK), 2016 WL 5720789, at *6 (S.D.N.Y. Sept. 30, 2016) (no triable issue when employer "directly tailored" its modifications to the "limitations" identified by injured employee,

despite the fact the modifications differed from those the employee requested); *Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 355 (S.D.N.Y. 2015), *aff'd*, 648 F. App'x 38 (2d Cir. 2016) (no triable issue when employer made "numerous modifications" to its training course to accommodate a deaf employee, despite the fact that it refused to provide him with an interpreter).[11] That Whitney failed to succeed with such accommodations does not mean those accommodations were unreasonable.

The adequacy of Montefiore's accommodations is further evident when considered in light of Whitney's requests. Whitney made 10 accommodation requests; Montefiore agreed to nine, either fully or in modified form; in opposing summary judgment, Whitney argues that, as to two (assignment of a mentor and targeted daily feedback), Montefiore fell short. But even if Montefiore's keeping its promises were the measure of liability for a failure to accommodate, Whitney has not adduced evidence on which a jury could find that it breached these promises.

First, Whitney claims that he "was not assigned a mutually agreeable mentor," despite his request for one. Pl. Br. at 31. But Whitney does not identify any evidence that Montefiore ever agreed to give Whitney a veto over the selection of a mentor. The evidence instead reflects that the hospital promised to "assign Dr. Whitney one designated contact person in the Department regardless of rotation (departmental coordinator)." Schmidt Decl., Ex. 34 at 1. The undisputed

---

[11] In general, "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (citing 29 C.F.R. § 1630.2(o)(3)). "The point of engaging in [such] an interactive process is to 'discover[] a means by which an employee's disability could have been accommodated.'" *Noll*, 787 F.3d at 98 (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 101 (2d Cir. 2009)). Whitney has not alleged Montefiore failed to engage in such a process; any such argument to the contrary would now be waived. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004). And, regardless, an "interactive process is not required when the end it is designed to serve— reasonable accommodation—has already been achieved," as it was here. *Noll*, 787 F.3d at 98.

evidence is that Montefiore made good on that promise, assigning Straker as his departmental

mentor.  JSF ¶ 115.

Whitney has not adduced evidence on which a reasonable factfinder could find that

Montefiore acted unreasonably in tapping Straker for this role; she was, at the time, Montefiore's

director of general anesthesiology, and one of its most experienced faculty members, having

taught residents there since 1997.  Straker Dep. 11–12; *see also* Ramachandran Decl. ¶¶ 94–95.

That Straker had, like other Montefiore attendings, earlier taken issue with Whitney's

performance is irrelevant.  It is well settled that a request to "avoid interactions with a particular

supervisor, who is simply disliked, is unreasonable."  *Hawana v. City of New York*, 230 F. Supp.

2d 518, 532 (S.D.N.Y. 2002).  To the extent Whitney sought a mentor who would give him

consistent feedback and could answer his questions, Montefiore fulfilled its side of the bargain.

*See, e.g.*, Schmidt Decl., Exs. 84–87 (transcripts of meetings during Whitney's accommodations

period between Straker and Whitney).

Second, Whitney argues that Montefiore breached its promised accommodations in that

"there was no effort made to explain to the faculty Dr. Whitney's disability/learning style and the

purposes of the accommodations."  Pl. Br. at 23.  But Whitney does not adduce evidence that

Montefiore ever agreed to do that.  Rather, in response to Whitney's request that Montefiore

provide "[g]uidance to staff members . . . as to when and how to provide instruction and

nonurgent teaching," it agreed to the following:

> The Department will inform each attending working with Dr. Whitney that they
> should speak with Dr. Whitney about the following items at some point each day:
> (i) how Dr. Whitney managed his time, (ii) how Dr. Whitney prioritized his tasks,
> whether he appropriately focused on the right things, and whether he fixated on
> something that he should not have, and (iii) areas for improvement.   The
> Department will also instruct each attending to expect that Dr. Whitney will have a
> checklist for each assigned day, and to honor Dr. Whitney's lunch and two 15
> minute breaks during the day.  In addition, the Department will inform each rotation

> mentor of the same, as well as the need to designate time with Dr. Whitney once per week to review his performance, answer his questions, and to be reasonably available (as possible) to Dr. Whitney for questions during the rotation. Lastly, the Department will ask the person who agrees to be his departmental coordinator to be available to him for questions throughout the three months, to speak with his rotation mentor at the end of each month and give feedback to Dr. Whitney as to how he performed.

Schmidt Decl., Ex. 34 at 8. The evidence is abundant and uncontradicted that Montefiore fulfilled those commitments. Indeed, asked during his deposition about Montefiore's accommodations, Whitney testified: "Feedback, I was getting it most days and that was fine." Whitney Dep. 203. Whitney has not cited to record evidence supporting his assertion that "no effort was made" by Montefiore to explain Whitney's accommodations to its faculty. Pl. Br. at 23.

Third, Whitney argues that the feedback he did "receive[] was cursory and begrudging." Pl. Br. at 23. But Whitney testified to the contrary: he attested that the feedback he received was "fine." Whitney Dep. 203; *see Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). He does not cite concrete evidence supporting his present critique. On the contrary, as Montefiore notes, the record contains Whitney's surreptitious recordings of numerous lengthy feedback sessions throughout his accommodations period. *See, e.g.*, Schmidt Decl., Exs. 96–112 (17 recordings of feedback sessions from December 2–22, 2020, 16 of which last more than 15 minutes). Whitney has not adduced evidence on which a reasonable factfinder would find for him on this formulation of his accommodation claim. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (assertions "blatantly contradicted by the record" must be rejected at summary judgment).

There is thus no genuine dispute of material fact on Whitney's failure-to-accommodate claim. On the undisputed evidence, summary judgment is in order for Montefiore on that claim, too.

### D.      Supplemental Jurisdiction

Whitney properly invoked the Court's jurisdiction on the basis of federal question jurisdiction, 28 U.S.C. § 1331, and brought his respective claims under state law on the basis of supplemental jurisdiction, 28 U.S.C. § 1367. With the Court having entered judgment for Montefiore on Whitney's federal claims, the sole surviving claims are brought under the New York City Human Rights Law ("NYCHRL").

Thus, the only basis upon which this Court could continue to exercise jurisdiction over the remaining claims is supplemental jurisdiction. But such jurisdiction is discretionary where the court has dismissed all federal claims. *See, e.g.*, *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013). A district court "'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Id.* (quoting 28 U.S.C. § 1367(c)(3)). Montefiore asks that the Court decline supplemental jurisdiction over these claims. Def. Br. at 29–30.

In deciding whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity." *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). In the typical case, however, once all federal claims have been dismissed, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

Here, consistent with that norm, the interests of judicial economy, convenience, and comity strongly favor declining to exercise supplemental jurisdiction.

First, the Court has not had occasion to consider Whitney's state-law claims, which the parties have not briefed.  *See, e.g.*, *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he state law claims should be dismissed so that state courts can, if so called upon, decide for themselves whatever questions of state law this case may present.").

Second, declining to exercise supplemental jurisdiction in favor of the state courts ought not materially delay the efficient forward progress of this case.  Because discovery is complete, the parties are equipped to litigate the state claims (whether on a motion for summary judgment or trial) in state court expeditiously upon Whitney's refiling.  *See Vuona*, 919 F. Supp. 2d at 394 ("The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery.").

Third, the case embeds potentially complex questions of state law.  Whitney's claims of discrimination under the NYCHRL are subject to a different standard than his federal claims. *See, e.g.*, *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).  The court hearing the remaining claims in this case will likely be tasked with determining the distinctly state-law question of whether, on the NYCHRL's more relaxed liability standards, Whitney's claims—even though clearly deficient under federal law—may reach a jury.  Familiarity with the NYCHRL will assist the court ultimately assigned to this case.

The Court accordingly declines to exercise supplemental jurisdiction over Whitney's state law claims.  These claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants Montefiore's motion for summary judgment on all of Whitney's federal claims. The Court declines to exercise supplemental jurisdiction over Whitney's state-law claims and dismisses these claims without prejudice to Whitney's right to pursue them in state court. The Clerk of Court is respectfully directed to terminate the motion pending at docket 60 and to close this case.

SO ORDERED.

*Paul A Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 8, 2023
New York, New York